MERCANTILE-SAFE DEPOSIT & TRUST COM-
PANY, TRUSTEE, ET AL. *v.* APPONYI

[No. 270, September Term, 1958.]

MERCANTILE-SAFE DEPOSIT & TRUST COM-
PANY, TRUSTEE *v.* EGAN, EXECUTOR

[No. 271, September Term, 1958.]

(Two Appeals In Separate Records)

*Decided June 10, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Norwood B. Orrick* and *Arthur W. Machen, Jr.,* with whom were *Venable, Baetjer & Howard* on the brief, for the appellant Mercantile-Safe Deposit & Trust Company.

*Ambler H. Moss,* with whom were *William A. Fisher, Jr.,* and *Semmes, Bowen & Semmes* on the brief, for the appellants Randolph Forrest Burke and N. Lombardi, guardian ad litem.

*Roger B. Williams* and *Roger A. Clapp,* with whom were *Hershey, Donaldson, Williams & Stanley* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

In 1894, in *Thomas v. Gregg,* 78 Md. 545, this Court selected the Pennsylvania Rule of apportionment of stock dividends between income and principal of a trust estate—that so much of the surplus of the corporation as was earned after the creation of the trust is, when distributed in the form of stock, presumptively income to the life tenant—as the most practicable and equitable test. In 1915, in *Northern Central*

*Dividend Cases,* 126 Md. 16, the Court was urged by eminent counsel for the corporate trustee, which appears in the case at bar, to follow what is now called the New Jersey Rule (the rule that the life tenant is limited to the dollar amount of earned surplus capitalized, that is to say, entitled to no more than the number of shares which, at fair market value, equals the number of dollars transferred from earned surplus to capital). Our predecessors rejected the New Jersey Rule and adhered to the principles of *Thomas v. Gregg.*

In 1930, dealing with a stock dividend, *Baldwin v. Baldwin,* 159 Md. 175, 182, held that the life tenant was not entitled to the entire dividend even though all of it represented capitalization of surplus earned during the period of the trust, because the value of the original investment in the trust had to be preserved. It was further specifically held that such value was not market value but book value. In 1939 the (Uniform) Principal and Income Act, Code (1957), Art. 75B, provided that dividends in the form of stock of the distributing corporation were principal as far as trusts created by will or deed effective June 1, 1939, or thereafter were concerned. The Act has been held not to apply to estates created before June 1, 1939. *Lindau v. Community Fund of Baltimore,* 188 Md. 474, 478.

In 1957, in *Donaldson v. Mercantile-Safe Dep. Co.,* 214 Md. 421, the same corporate trustee now appearing earnestly argued as to a pre-1939 trust that stock splits of the Texas Company and of the American Gas & Electric Company, even though in substantial part representing capitalization of surplus earned after the creation of the trust, were not apportionable because modern corporate and financial practices and the effects of inflation made the Pennsylvania Rule inequitable and inapplicable to currently prevalent stock splits. We adhered to the principles of the earlier Maryland decisions and held that the shares received by the trustee were to be apportioned according to three tests, which both the trustee and the life tenant agreed were the law of Maryland on the subject. Test number three —which is the only one now sought to be repudiated by the trustee—is that the number of shares remaining in the corpus of the trust, after giving the life tenant his shares, multiplied

by the number of dollars of book value per share as shown by the corporate books, must equal or exceed the original dollar book value of the trustee's acquisition cost of the stock involved. If the distribution of the new stock to the life tenant would leave an insufficient number of shares in the trust corpus to bring about this result, then, to the extent of the deficiency, the number of shares distributable as income must be proportionately reduced.

Following the *Donaldson* decision, the corporate appellant in the instant case reviewed its many trust accounts and determined that there were some fourteen hundred in which apportionments of stock dividends or splits would have to be made; and, as a result, corpus would lose and income beneficiaries receive stock of the value of some seven million dollars. Whereupon, in an effort to retain in the corpus of the trusts a greater portion of these stock dividends and splits, the corporate appellant caused to be prepared and filed the test cases before us, which were consolidated below and argued together here. One of the cases is concerned with a trust created by the will of Edward F. Burke, who died in 1915, in which the trustee holds stock received in the 1954 stock split of the General Electric Company. In the other case, the trustee under the will of John Quinn, who died in 1899, holds stock distributions recently received from the American Cyanamid Company, the General Electric Company, the American Gas & Electric Company, and the Texas Company, as to which it desires instruction as to their proper apportionment.

The propositions urged in the alternative in the Burke case by the appellant corporate trustee, and concurred in by the remaindermen in that case, another appellant, are: the General Electric Company's 1954 stock distribution was not a dividend calling for apportionment; the New Jersey and not the Pennsylvania Rule should apply; and, finally, the third test of the Pennsylvania Rule as used in Maryland should be "refined" (to use the word of the trustee) so as to compare book values as of the time of acquisition not in dollars but by the measure of real purchasing power calculated by the use of comparative indices, as against the book values at the time of the dividend.

The chancellor held that the General Electric stock distribu-

tion was a dividend that required apportionment; that the Pennsylvania Rule, not the New Jersey Rule, applies; and that dollar book value at acquisition should be compared with dollar book value at the time of the dividend in determining whether corpus would remain unimpaired if all of the stock representing surplus earned during the trust was paid over as income. We think Judge Warnken's holdings were right and that the prior Maryland cases foreclose the appellants from prevailing as to any of their contentions.

The contention that the General Electric distribution did not constitute an apportionable dividend rests on the claim that it was not a stock dividend but rather a change and conversion of no par value stock of the stated value of $6.25 a share into stock of $5.00 par value and, therefore, a reorganization similar to that considered in *Safe Deposit & Trust Co. v. Bowen,* 188 Md. 482. The *Donaldson* case answers these claims and requires their rejection. In that case the stock split of the American Gas & Electric Company, which was held to be apportionable, is not to be distinguished from the stock split of the General Electric Company. Both companies used the same mechanics. It is conceded that the General Electric distribution was supported as to 87½% of the new capital by a transfer from surplus earned during the period of the trust, and that the balance of 12½% was produced by the change in the outstanding capital stock. The *Donaldson* case established that where surplus is capitalized and paid over as a stock split, the life tenant is entitled to the proportion of the new stock that represents surplus earned during the trust. The Court of Appeals of New York reached the same conclusion as to the General Electric distribution now under discussion in *In re Fosdick's Trust,* 152 N. E. 2d 228, 232-233. There the deed of trust directed the disposition that was to be made of stock dividends and the Court adopted the statement of an earlier New York case that it has "been uniformly held that a declaration of dividend such as was made by the General Electric [Company] can only be construed and determined to be a stock dividend."

The *Bowen* case was cited to the Court in the *Donaldson* case as an authority for the proposition that recapitalization

in a reorganization is not an apportionable event and was found not to be applicable to the facts of the American Gas & Electric Company stock split. It is no more applicable here. In the *Bowen* case preferred stockholders were offered a proposal, which they could accept or reject, to take debenture notes and new preferred and common stock for the old preferred stock and accrued and unpaid dividends. Despite the fact that there was some capitalization of earned surplus, the Court there said at pages 484 and 489 of 188 Md.: "* * * the securities are not stock dividends but are new securities received on a reorganization of a corporation", and "It is our conclusion that the transaction in this case was the exchange of one type of securities for another. It was in no sense similar to the declaration of a dividend. It was more in the nature of a sale. We think none of the new securities were intended as payment in whole or in part of the unpaid dividends. As a result, the new securities in their entirety belong to the corpus of the estate * * *." It is clear that the *Bowen* case is entirely different from the case at bar.

The appellants' contention that the New Jersey rather than the Pennsylvania Rule should be applied is answered by the long line of cases from *Thomas v. Gregg, supra,* in 1894, to the *Donaldson* case in 1957, all of which have consistently applied the Pennsylvania Rule, and by the fact that in *Northern Central Dividend Cases, supra,* the Court refused to follow the New Jersey Rule which was urged upon it by counsel for the trustee.

In its endeavor to have the Court refine or modify the third test, which determines the number of shares distributable to the income beneficiary, the trustee undoubtedly chose the Burke trust as a test vehicle because of the provisions of the will and the composition of the estate. The testator provided that the trustee could retain stocks owned by him at his death but that in making new investments it was limited to "good interest-bearing securities." In addition to several railroad stocks of small value, testator owned 130 shares of General Electric Company at his death. Its market value then was approximately $21,000 and that of the other assets owned by him some $175,000, making a total in the estate of approxi-

282

mately $200,000. By 1930, as a result of two 4-for-1 stock splits, in neither of which was there any capitalization of earnings, the trustee held 2,080 shares of General Electric stock, of which it sold 1,080 shares in 1935, retaining 1,000 shares. On June 11, 1954, there were received 2,000 additional shares, the trustee's proportion of the 3-for-1 split of the company's stock. At the end of 1958 the market value of the General Electric stock was some $270,000. The value of the other assets of the trust was some $185,000, so that the trust had increased its acquisition market value by some $255,000, almost all of which was represented by the increase in the value of the General Electric Company stock. Since 87½% of the new shares of General Electric stock distributed in 1954 represented capitalization of surplus earned during the period of the trust, the life tenant in the Burke trust would be entitled to 1,750 shares under the prevailing Maryland law. These shares had a market value of $68,000 in 1954, which was about 20% of the total corpus of the estate including such shares, or about 26% of the total estate excluding them. At the end of 1958 the 1,750 shares had a market value of about $137,000, or approximately 30% of the value of the entire estate including them, or 43% of the total, excluding them. The distribution would reduce the annual income of the estate by about $3,500, making it less than it was in 1926, the first year the corporate appellant was trustee.

The appellants urge that present-day conditions, particularly inflation, require that the book values to be compared, (which are the book value at the time of acquisition and the book value remaining after distribution to the life tenant) in the test of whether corpus is or is not impaired, should be measured not in dollars but in purchasing power at the respective periods of time involved. They say that the dollar book value should be adjusted to actual purchasing power by use of the Wholesale Price Index—All Commodities (1947-1949 equals 100), issued by the Bureau of Labor Statistics, United States Department of Labor, so that the 1915 book value of the General Electric stock would be translated into 1954 dollars and, as so adjusted, compared with the 1954 book value. The 1915 dollar book value of General Electric stock held by the trust

was $8,575.97. The adjusted book value, expressed in 1954 dollars, would be $19,335.80. The 1954 dollar book value, after the distribution to the life tenant of 1,750 shares, would be $11,650.10, showing no impairment in corpus of the original book value. On the other hand, if the adjusted book values are compared, there is an impairment of $7,685.70 (adjusted 1915 book value of $19,335.80 minus 1954 book value of $11,-650.10), and under the *Baldwin* case, the trustee would be required to retain as principal 874 of the 1,750 shares (enough at book value of $8.80 per share to equal $7,685.70), and the life tenant, instead of receiving 1,750 shares, would receive 876 shares.

In the Quinn trust, because the General Electric stock was held only from December, 1951 to June, 1954, there was a reversal of the inflationary spiral, and if the adjusted test is used, income would receive 64 shares instead of 57 shares that the dollar book value comparison produces. In the case of American Cyanamid Company, the distribution would be precisely the same under either test. Substantially more American Gas & Electric Company stock and Texas Company stock would be retained in corpus under the adjusted value test.

The life tenants say that the inflation argument is over-emphasized, pointing out that during the life of this country there have been many periods of inflation and deflation, that during the War of 1812 wholesale prices rose 54% in two and a half years, during the Civil War they rose 150% in four years, and from the outbreak of the First World War to the peak of inflation in 1920, rose 140%. They point out that if stock with a book value of $100.00 a share was purchased in 1917, its adjusted book value in 1920 would have been $134.80, while if the computation had been made as of 1922, the adjusted value would have been $84.24 a share, and suggest that under appellants' theory if there had been a 10% stock dividend in 1920 all would have been allocated to corpus, while all of the same dividend in 1922 would have been paid to the life tenant. They note, too, that in the Quinn case the adjusted value test gave corpus fewer shares than the book value test in the General Electric distribution, and made no difference whatever in the American Cyanamid distribution.

The life tenants go further and question the soundness of the claim of appellants that the adjusted book value test is more reliable than the dollar book value comparisons. They argue that the nature of book value is such that while its relationship to actual current value is, or may be relatively slight, the discrepancy is more or less constant because the book value of a share of stock was computed in 1915 by the same basic accounting principles as it is computed today. This, appellees claim, makes the standard as exact, for purposes of comparison, as is practicable to achieve.

We need not attempt to decide the desirability of following the course suggested by the appellants nor the merit of the arguments of the life tenants.

The *Baldwin* case made the Maryland law to be that the actual or intrinsic value of the corpus that must be preserved is that expressed in terms of book value. The *Baldwin* holding was restated in *Heyn v. Fidelity Trust Company,* 174 Md. 639, 663-665, in *Lindau v. Community Fund of Baltimore,* 188 Md. 474, 479 (cited above) and the *Donaldson* case. In the *Donaldson* case the argument of inflation was urged upon the Court, indeed, was very earnestly pressed.[1]   We would not

---

1. In the brief of the trustee at pages 13-14 there was the following:

"It is not equitable that the life tenant should receive an even larger return than this at the expense of the remaindermen, whose interest is at the same time being further impaired by inflation. The past twenty years has been a period of inflation, marked by a continuing decline in the purchasing power of the dollar, and all indications point to a continuation of this trend, to a greater or less extent, for the foreseeable future. . . . If the Court should hold that the additional shares distributed in a stock split belong to the life tenant, this will accentuate the effects of inflation in impairing the real value of the corpus of the trust; for not only will the value of the corpus be impaired by the impact of inflation itself, but the impairment will be accelerated and magnified through the distribution as income of additional shares which are themselves the product of inflation.

"Changes in economic conditions, financial practices and corporate procedures which have taken place over the past twenty-five years have produced conditions which are fundamentally

limit the Pennsylvania Rule, as the appellants urged us to do in the *Donaldson* case because of inflation, and in partial answer to the argument said that the combined market value of the stocks there involved at the time of the hearing was more than twice as much as their acquisition costs. This is more than true in the Burke case. The market value of the General Electric stock in 1915 was some $21,000. The 1,000 shares of stock sold in 1935 brought in some $32,000, and the stock on hand in 1954, after discounting the 1,750 shares of the life tenant, had a market value of $48,500, so the original $21,000 became worth $80,000 to corpus.

Our conclusion is that the argument of inflation, now used to support the desirability of a different method of computation to help preserve corpus, is no more controlling than it was in the *Donaldson* case when used to support the argument that there should be no extension of the Pennsylvania Rule to stock splits. The *Baldwin* case, the *Heyn* case, the *Lindau* case, and the *Donaldson* case settled the Maryland law that dollar book value is the measure of impairment of corpus, and we shall not unsettle it.

One further question remains. The Burke will provides that the net income shall be paid over as directed after "setting aside * * * such sums as my said trustees or the survivor or

different from those which prevailed when the so-called Pennsylvania Rule was adopted and evolved by the courts. It is open to serious question whether that Rule furnishes valid or equitable standards for the apportionment of stock dividends under present conditions.

"The rule calling for the protection of the remainderman by preserving the intact value of the principal of the trust measured in terms of dollars, is based on the assumption that the dollar is a stable measure of value. This was not an unreasonable assumption at the time when the Pennsylvania Rule was evolved and the gold standard prevailed. But the abandonment of the gold standard and the ensuing decline in the purchasing power of the dollar has destroyed the dollar as a stable measure of value. The keystone of the Pennsylvania Rule has thus been removed, and it is perfectly obvious that its continued application under present conditions will not preserve the real value of the corpus for the benefit of the remaindermen, as the rule was intended to do."

successors in trust may think advisable to set aside each year for keeping unimpaired the principal thereof." Appellants say that although they have not determined whether they should exercise whatever power the quoted language gives them to retain some or all of the stock which would be payable to the life tenant under the Pennsylvania Rule, as it has been applied in Maryland, they would like to be instructed as to whether the power could be so used. The chancellor did not answer the question. We think the power could not be so used. At the time of the execution of the will in 1908, the Pennsylvania Rule for apportioning stock dividends was firmly established in Maryland. It is hardly to be contemplated that the testator thought that an apportionment would cause an impairment of corpus, as he used the phrase in his will, when the law at the time of the execution of the will required such an apportionment. Further, the testator contemplated that the great bulk of his estate was to be invested in interest-bearing securities as it was at the time of his death. We read the will as giving the trustee power to restore to corpus from income realized capital losses.

*Decrees affirmed, with costs.*