GEIER ET AL. *v.* MERCANTILE-SAFE ·DEPOSIT AND
TRUST COMPANY, ETC. ET AL.

[No. 17, September Term, 1974.]

*Decided November 18, 1974.*

*Motion for rehearing filed December 17, 1974; denied January 6, 1975.*

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*William L. Marbury* and *G. Van Velsor Wolf,* with whom were *Donald P. McPherson, III* and *Piper & Marbury* on the brief, for appellants.

*J. Nicholas Shriver, Jr.,* and *Donald C. Greenman,* with whom were *Ober, Grimes & Shriver* on the brief, for appellees Delle S. Ernst and Sarah Ernst Darnall. No brief filed on behalf of other appellees.

SINGLEY, J., delivered the opinion of the Court. LEVINE, ELDRIDGE and O'DONNELL, JJ., dissent and ELDRIDGE, J., filed a dissenting opinion in which LEVINE and O'DONNELL, JJ., concur at page 125 *infra*.

In May, 1970, Mercantile-Safe Deposit and Trust Company (the Mercantile) and George Stugard, trustees of the trust estate created by the will of Richard P. Ernst, received a distribution of 56,000 shares of the common stock, without par value, of The Procter & Gamble Company (the Company) as a consequence of what was characterized by the Company as a two-for-one split of its stock. Mindful of the decisions of this Court in *Donaldson v. Mercantile-Safe Deposit and Trust Company*, 214 Md. 421, 135 A. 2d 433 (1957) and *Mercantile-Safe Deposit and Trust Company v. Apponyi*, 220 Md. 275, 152 A. 2d 184 (1959), the trustees [1] filed a bill of complaint in Circuit Court No. 2 of Baltimore City, in which they sought the court's instructions as to whether those 56,000 shares of the Company's stock should be allocated entirely to income, entirely to principal, or apportioned between income and principal.

Named as parties defendant in the proceeding were the two income beneficiaries of the trust, the daughter and daughter-in-law of the testator; the succeeding income beneficiaries, three granddaughters of the testator; and those who then held the remainder interest, a group consisting of 10 great grandchildren of the testator, three of whom were minors. Service by publication was had on nonresident, minor and unknown defendants.

From a decree awarding the 56,000 shares of the Company's stock to the income beneficiaries, the three minor remaindermen, great grandchildren of the testator, entered an appeal to the Court of Special Appeals. We granted certiorari and directed that the case be docketed in this Court.

Certainly, until 1933 the testator, Richard P. Ernst, who

---

1. Mr. Stugard died while the proceeding was pending. It was concluded by the Mercantile, as remaining trustee.

lived in Covington, Kentucky, with his invalid wife, was domiciled there. He had represented Kentucky in the United States Senate from 1921 until 1927, when he was defeated by Alben W. Barkley. A member of the Kentucky bar, his law office was in Cincinnati, Ohio, across the Ohio River from Covington.

It would seem that during the depression, Senator Ernst's financial affairs had become quite involved. At the time of his death in 1934, his securities, including 47,170 shares of the stock of the Company which he then owned, were pledged as collateral with banks and brokerage houses in Cincinnati to secure loans of more than $1,000,000.00. Additionally, for a period of some 10 years prior to his death, the Senator had not paid the tax levied by Kentucky on securities owned by residents, with the consequence that more than $100,000.00 in unpaid taxes, interest and penalties had accumulated when he died.

From 15 May to 1 June 1933, Senator Ernst was a patient at Johns Hopkins Hospital in Baltimore, where he underwent a cataract operation. The hospital records described him as a resident of Covington, Kentucky.

Upon his release from the hospital, Senator Ernst returned to Covington. On 3 July 1933, in his law office in Cincinnati, he executed the will which was ultimately admitted to probate, a will which he had drawn himself. In it, he described himself as "of the County of Washington, State of Maryland." To the extent here pertinent, the will created a residuary trust, the income from which was payable to Susan Brent Ernst, the Senator's widow, for life; on her death, one half became payable to his son, William Ernst, and to the son's wife, Delle S. Ernst, and to the survivor of them, for life. The other one half became payable to the Senator's daughter, Sarah Ernst Darnall. On the death of the survivor of William and Delle, that share of income will be payable to their children in equal shares. On the death of Sarah, her share of income is to be added to the share limited in favor of William, Delle and their children. On the death of the last survivor of the children of William

and Delle, the remainder is to be divided among the issue of said children.

The Senator's son, William; a lawyer who was associated with the Senator, George Stugard, and Mercantile Trust Company of Baltimore [2] were named as executors and trustees. If Mercantile did not act, the will provided that the individuals were empowered to name as another trustee "a corporation organized and doing business in the State of Maryland."

On 13 July 1933, Senator Ernst conveyed his residence in Covington, together with its contents, to his wife for life, with remainder to his children as joint tenants. At about the same time he conveyed other Kentucky real estate directly to his children.

On 6 November 1933, Senator Ernst took title to residential property at Blue Ridge Summit, in Washington County, Maryland. The deed, which was recorded among the land records at his request on 10 November, described him as "of Washington County, Maryland," vested a life estate in him with remainder in his son and daughter. Furniture located in a Washington apartment which he had retained since his term in the Senate was moved to the house, and extensive repairs were contracted for, the work being done between October, 1933, and May, 1934. Mr. Stugard testified that to his knowledge the Senator spent "at least one night" in this house.

In January, 1934, Senator Ernst left Covington for Los Angeles, where he boarded a ship bound for New York through the Panama Canal. Somewhere between Panama and Cuba, he suffered a stroke. William Ernst met the ship in Cuba, accompanied his father to New York, and took him from the dock to the Johns Hopkins Hospital in Baltimore, where the Senator died on 13 April 1934.

The Orphans' Court of Washington County, Maryland granted letters testamentary on the Ernst estate to George

---

2. Mercantile-Safe Deposit and Trust Company is the successor by merger to Mercantile Trust Company of Baltimore.

Stugard and Mercantile Trust Company of Baltimore. Mr. Stugard said that William Ernst had declined to qualify as executor because, although he lived in Ohio, he did not want to be subject to service of process in connection with tax claims against the estate, on visits to his mother in Covington. Later, William Ernst did qualify as a co-trustee, however.

With court approval, the executors retained Kentucky counsel to negotiate a settlement of the Kentucky tax claims, including the tax assessed for 1934 on securities owned by the Senator on 1 July 1933. These were settled for $91,525.08, and the executors paid counsel a fee of $25,000.00 for services in connection with the settlement.

The first administration account filed in the Ernst estate accounted for a total personal estate of $1,887,530.31 which was substantially reduced by the payment of debts and expenses of administration. Maryland inheritance, Maryland estate and federal estate taxes were paid by the executors. The executors' federal estate tax return described Senator Ernst as a resident of Blue Ridge Summit, Maryland. The assets which were ultimately distributed to the trustees included 13,705 shares of the Company's stock with a date of death value of $486,527.50 and a book value of $14.01 per share, or $192,007.05.[3] Of this holding, 1,470 shares were later sold or distributed, leaving 12,235 shares with an aggregate "intake" value [4] (historic book value, adjusted for sales and distributions by the trust and for purchases by and distributions to the trust) of $171,412.35.

At 30 April 1950, a distribution of 6,117 shares was received, increasing the holding to 18,532, but decreasing the intake value to $9.34 per share. In 1955 and 1956, 3,852 shares were sold, leaving 14,500 shares with an intake value of $135,434.67.

On 2 July 1956, an additional 14,500 shares were received,

---

**3.** An additional 157 shares received by the estate in consequence of a 1939 stock dividend of 1/75 share for each share held, were distributed to the income beneficiaries by the trustees.

**4.** This is sometimes also referred to in the cases as the "intact" value.

increasing the holding to 29,000 without affecting the aggregate intake value. A sale of 1,000 shares on 1 July 1957 reduced the holding to 28,000 shares and the intake value to $130,764.67. On 11 April 1961, a two-for-one distribution increased the holding to 56,000 shares, leaving the aggregate intake value unchanged.

This was the situation in May of 1970, when the trustees received the distribution of 56,000 shares which gave rise to this case. This distribution had the result of reducing the intake value to $1.1675 per share, if $130,764.67 is divided by 112,000 shares.

Prior to the 1970 distribution, Procter & Gamble had authorized 50,000,000 shares of common stock, without par value, of which 40,775,413 shares, with a stated value of $1.00 per share, were issued and outstanding. The distribution of 40,775,413 additional shares was accomplished by increasing the number of shares authorized to 100,000,000 and by transferring an amount representing the stated value, as fixed by the directors at $1.00 per share in response to Ohio law, aggregating $40,775,413.00 from earned surplus to the capital account. *See* Page's Ohio Revised Code (1964 Repl. Vol.) Title 17, § 1701.30. The adjusted book value (per the books of the Company) of stock outstanding after the distribution was $15.40 per share.

Mr. Dean P. Fite, financial vice president of the Company, in his deposition explained that in 1939 the Company had made a distribution of 1/75 of a share for each share held, a distribution described by the Company as a stock dividend. This was accomplished by the issuance of stock held in the treasury of the Company. At that time, the Company's earned surplus account was debited and its capital stock account credited in the amount of $4.00 for each share which was issued.

As a result of this distribution, the Ernst estate received the 157 shares of the Company's stock referred to in footnote 3, *supra*. The trustees regarded these shares as allocable to income, and delivered them to the income beneficiaries.

The succeeding distributions were all characterized by the Company as a "split-up," and, until 1970, involved no transfers of earned surplus to the capital stock account. In 1950, a distribution changed each share with a stated value of $4.00 each into 1$^1/_2$ shares of stock with a stated value of $2.66 per share.

In 1956, the Company's shares without par value were changed into 2 shares having a par value of $2.00 per share. The issuance of the additional shares was supported by a transfer from the capital surplus account to the capital stock account.

In 1961, each share of $2.00 par value stock was changed into 2 shares of stock with a stated value of $1.00 per share. As a consequence, there was no change in the capital stock account.

George Pausch, then a senior vice president of Mercantile-Safe Deposit and Trust Company, had testified in *Donaldson v. Mercantile-Safe Deposit and Trust Company, supra*, 214 Md. 421, as well as in *Mercantile-Safe Deposit and Trust Company v. Apponyi, supra*, 220 Md. 275. He described three tests to be applied, in his opinion, under the Maryland cases to determine what portion of a stock dividend must be allocated to the life tenant of a trust created prior to 1 June 1939 (the effective date of the Uniform Principal and Income Act, Chapter 580 of the Laws of 1939, Maryland Code (1957), Art. 75B). They are: [5]

(i)

"The earnings of the paying corporation, accumulated and undistributed in the period during which the stock has been held by the individual trust estate, must equal or exceed the amount charged to earned surplus in connection with the dividend. If such earnings are less than the amount charged to earned surplus, then, the number of

---

5. A summary of Mr. Pausch's testimony may be found in the record extract filed in the *Donaldson* case at 26-41; his testimony in the *Apponyi* case appears in the record extract in that case at 131-39.

shares payable to the life tenant as income must be proportionately reduced."

If this test is applied to the 1970 distribution, on 30 June 1934, the end of the fiscal year immediately following the death of Senator Ernst, the Company had an earned surplus of $47,370,013.00. On 30 June 1970, after the transfer of $40,775,413.00 from earned surplus to the capital account in connection with the 1970 distribution, the earned surplus account stood at $1,066,765,000.00.

As a consequence, as the parties have stipulated, the earnings of the Company which had accumulated during the period when the stock was held by the trust estate exceeded by far the amount charged to earned surplus in connection with the 1970 distribution.

### (ii)

"The life tenant is entitled to only such portion of the shares distributed as the amount appropriated from earned surplus to capital stock account on the books of the paying corporation bears to the total amount transferred to capital stock account."

Here, the entire amount transferred to the capital stock account, $40,775,413.00 was charged against the earned surplus account. No charge was made against capital surplus. As a consequence, this test imposed no limitation on the distribution.

### (iii)

"The number of shares retained in the corpus of the trust multiplied by the per share book value (i.e., on the books of the corporation) of the stock immediately after the dividend in question must equal or exceed the original book value of the Trustee's investment in this particular holding. If the distribution of the new stock to the life tenant would leave in the corpus of the trust an insufficient number of shares to bring about this result, then to that extent the number of shares

distributable as income must be proportionately reduced."

Applying this test to the Ernst trust, prior to the 1970 distribution, there was a 56,000 share holding with an intake value of $130,764.67. After the distribution these same 56,000 shares had a book value of $15.40 per share, and an aggregate book value of $862,400.00 on the books of the Company, which is substantially in excess of the intake value. This test was also met.

The application of these tests in *Donaldson, supra*, which dealt with a trust created prior to the enactment of the Uniform Principal and Income Act in 1939, resulted in a distribution to the life tenant of 466 shares of the stock of The Texas Company, out of a total holding of 800 shares, as a consequence of distributions made in 1951 and 1956, described by the company as stock splits, but supported in part by transfers to the capital stock account of earned surplus accumulated while the stock was held by the trust. For a similar reason, a distribution made by American Gas and Electric Company in 1956, also described by the company as a stock split and supported in part by a transfer from earned surplus, was held to be apportionable to the extent of 50.63 shares, which were distributed to the life tenant.

*Apponyi, supra*, involved two trusts, created in 1899 and 1915. The earlier trust had received distributions described as stock splits from American Cyanamid Company, General Electric Company, American Gas and Electric Company, and The Texas Company. The later trust had received only the General Electric Company distribution.[6] The Court determined that all of the distributions were apportionable between income and corpus and that to the extent that the distributions were supported by a capitalization of earned surplus accumulated during the term of the trust, were distributable to the life tenant.

---

6. The transfer of 1,750 shares to the life tenant reduced the market value of trust assets from approximately $455,000.00 to $318,000.00.

For a comprehensive discussion of the problem faced by trusts created prior to 1 June 1939, *see* Machen, *The Apportionment of Stock Distributions in Trust Accounting Practice,* 20 Md.L.Rev. 89 (1960).

The chancellor, Ross, J., although he characterized the result as "bizarre," [7] looked upon the case as controlled by *Donaldson* and *Apponyi,* both *supra,* and entered a decree directing that the 56,000 shares of the Company's stock be distributed to the income beneficiaries, Delle S. Ernst and Sarah Ernst Darnall, in equal shares.

The appellants advance five reasons why the decree entered below should be reversed, or, at the very least, should be modified:

> (i) Senator Ernst was domiciled in Kentucky at the time of his death.
> (ii) The apportionment of stock distributions received by the trustees under Senator Ernst's will is determined by the law of his domicile.
> (iii) Under Kentucky law, the stock distribution made in 1970 would be treated as principal, not income.
> (iv) If Maryland law applies, the shares received by the trustees are allocable to principal and not to income by virtue of the provisions of Code (1957, 1969 Repl. Vol.) Art. 75B, § 6 (a) as amended by Chapter 877 of the Laws of 1965.
> (v) Even if the allocation of the shares is governed by Maryland law as it existed prior to the enactment of Art. 75B, § 6 (a) in its present form, the income beneficiaries are entitled to no more than the number of shares having a book value equal to the amount of earnings capitalized in issuing 56,000 shares to the Ernst trust.

---

7. In April, 1973, the value of the assets of the trust was $13,646,554.00, which included a value of $5,992,000.00 attributable to the 56,000 shares of the stock of The Procter & Gamble Company received in the 1970 distribution.

We propose to consider the first three contentions together, and then pass to a consideration of the remaining two contentions.

(i), (ii) and (iii)

The chancellor made a specific finding as regards domicile:

> "In the absence of designation or expression of intent by the testator to the contrary the law of the domicile of the testator at the time of his death controls. While there may be doubt as to whether he succeeded, the evidence is clear that the testator intended to die domiciled in Maryland or at the minimum to be considered as domiciled in Maryland at his death so that the administration of his estate is governed by the law of Maryland. Under the circumstances it is unnecessary to determine whether or not the testator actually succeeded in establishing a domicile in Maryland before his death or to decide any of the other questions relating to domicile, because even if he were held to have been domiciled in Kentucky, Maryland law nevertheless would control."

Maryland Rule 886 would restrain us from disturbing such of this as may constitute a finding of fact, even were we inclined to do so, unless it is clearly erroneous. To begin with, Delle S. Ernst, the Senator's daughter-in-law, was asked about the purchase of the residence in Blue Ridge Summit:

> "Q Didn't he buy it because he intended to live in Maryland?
> "A Yes, that was his hope; he just didn't live long enough."

When we add to this the evidence regarding the disposition of the Kentucky real estate; the purchase, improvement and furnishing of the house at Blue Ridge Summit; the declaration regarding domicile which the Senator made in

the will which he drew; his selection of a Maryland corporate co-executor and co-trustee; the provision for the substitution of another Maryland corporate co-trustee, if the Mercantile failed to qualify, or resigned; Mr. Stugard's testimony regarding the Kentucky tax problems, and William Ernst's reluctance to qualify as an executor of his father's will, a clear picture emerges: that of an individual who wished to extricate himself completely from his native state and to seek a haven elsewhere, in this case, in Maryland. On the record, we cannot say that the chancellor's finding was clearly erroneous.

As Judge Prescott, for the Court, noted in *Gallagher v. Board of Elections*, 219 Md. 192, 198, 148 A. 2d 390, 393 (1959):

> "In dealing with questions relating to 'residence' or 'domicile,' or both, the intention of the party who is alleged to have had the residence or to have changed his domicile is one of the vital factors to be considered. A person's intention at any particular time is, of course, a question of fact. We recently quoted, with approval, a celebrated statement to the effect that the state of one's mind is as much a question of fact as the state of his digestion. *Tufts v. Poore*, 219 Md. 1 [, 11], 147 A. 2d 717 [, 723] [1959]."

Turning now to the applicable principles of law, it is true that the law of a testator's domicile usually will control the administration of his estate, including the construction of his will, absent a contrary expression or contrary intent. The chancellor relied upon 2 Restatement (Second) of Conflict of Laws § 268 (2), at 144 (1971), which, after noting that a will creating a trust of personalty will be construed in accordance with the rules of a state designated for this purpose, continues:

> "(2) In the absence of such a designation, the instrument is construed
>
> "(a) as to matters pertaining to administration,

in accordance with the rules of construction of the state whose local law governs the administration of the trust, and

"(b) as to matters not pertaining to administration, in accordance with the rules of construction of the state which the testator or settlor would probably have desired to be applicable."

*See particularly* comments *f* and *h. See also* 5 A. Scott, The Law of Trusts § 576, at 3840-44; § 586, at 3867-68 (3d ed. 1967), for a discussion of conflict of laws problems which are encountered in decedents' estates, and of the treatment of the allocation of stock distributions by the cases as either an administrative matter or as a question of construction. *See In re Grant-Suttie's Estate,* 205 Misc. 640, 129 N.Y.S.2d 572 (Surr. Ct. 1954). *See also* Bright, *Permitting a Non-Resident to Choose Place of Probate,* 95 Trusts and Estates 865 (1956).

If a contrary intent is manifest, this will control even in the absence of an express designation, Restatement, *supra,* § 268, comment *b;* 5 A. Scott, *supra,* § 576. To the same effect, *see In re Grant-Suttie's Estate, supra; In re Ryan's Estate,* 178 Misc. 1007, 36 N.Y.S.2d 1008 (Surr. Ct. 1942), *aff'd,* 265 App. Div. 1051, 41 N.Y.S.2d 196 (1943); *In re Stebbins-Vallois' Estate,* 99 N.Y.S.2d 402 (Surr. Ct. 1950), and particularly, *In re Chappell's Estate,* 124 Wash. 128, 213 P. 684 (1923).

In *In re Chappell's Estate, supra,* a testator, domiciled in California, described himself in a will which he executed in King County, Washington, as "of King County, Washington." The trust created by the will left personalty located in Washington to trustees residing there. Valid under Washington law, the dispositive provisions would have been void as violative of the California law controlling restraints on alienation had the will been admitted to probate in California. The court concluded that under all these circumstances, the testator manifested an intent that the distribution of the estate was to be controlled by the law of Washington.

If the facts found by the chancellor are given the weight they deserve, it is difficult to conceive of a case where intention could be made more manifest short of a specific designation of what law was to control. As a consequence, even if we assume for purposes of argument, that Senator Ernst was domiciled in Kentucky at the time of his death, the law of Kentucky would not have controlled the administration of his estate, and it is unnecessary for us to consider what the law of that Commonwealth was, or may now be.

Moreover, while the proceedings may not have foreclosed any of the rights of the infant remaindermen, the record discloses that the issue was not raised at the time the will was admitted to probate in Washington County, nor was it raised in two equity proceedings in Baltimore City: one in which the corporate co-trustee sought unsuccessfully to have the court assume jurisdiction over the administration of the trust, and another in which the dispositive provisions of the will were the subject of judicial construction.[8]

Annotated Code of Maryland (Bagby, 1924) Art. 93, § 14 which was in effect at the time that Senator Ernst's will was admitted to probate, provided in part:

"Whenever any person shall die intestate, leaving in this State personal estate, letters of administration may forthwith be granted by the orphans' court of the county wherein was the party's mansion house or residence. . . ."

Section 351 of the same article continued:

"Any will or codicil may be proved in any county or Baltimore City wherein letters testamentary or of administration may be granted."

*Harding v. Schapiro*, 120 Md. 541, 87 A. 951 (1913), relying on the predecessors of the statutory provisions above quoted,

---

8. The first, Mercantile Trust Company v. George Stugard, Circuit Court of Baltimore City, No. A-23220, Docket A-410 (1938); the second, George Stugard v. Sarah Ernst Darnall, Circuit Court No. 2 of Baltimore City, No. 28532A, Docket 55A 1078 (1946).

and on *Stanley v. Safe Deposit and Trust Company*, 87 Md. 450, 40 A. 53 (1898) would seem to be authority for the proposition that the admission of a will to probate by an orphans' court, absent any direct appeal, is conclusive of the issue of the testator's place of residence. Because of the testator's intention as developed from the facts, we find it unnecessary to rely on the statute or the cases.

The infant appellants cite E. Miller, Jr., Construction of Wills in Maryland § 3, at 10 (1927) in support of the proposition,

> "The general rule is that a will of personalty is to be construed with reference to the law of the domicile of the testator at the time of his death, unless it appears on the face of the will that the testator intended it to be construed with reference to some other law; . . . ."

and rely on *Hall v. Morris*, 213 Md. 396, 132 A. 2d 113 (1957) (which affirmed a finding on the facts, that a decedent was domiciled in Florida) and *Smith v. Mercantile Trust Company*, 199 Md. 264, 86 A. 2d 504 (1952). (While recognizing the rule that a testator may direct that the disposition of his personal estate shall be construed under the law of a state other than that of his domicile, the Court held that an appropriate direction was lacking.) To us, it seems clear that the proposition stated by Miller contains the usual qualification, which, depending on the facts, may or may not be applicable, and the cases are no more apposite than that of *Staley v. Safe Deposit & Trust Co. of Baltimore*, 189 Md. 447, 56 A. 2d 144 (1947) (Deed of trust executed by a resident of Illinois is to be construed under Illinois law, there being no contrary direction).

### (iv) and (v)

In 1929, Maryland made its first attempt to deal with the apportionment of dividends by statute. Chapter 495 of the Laws of 1929, Code (1935 Supp.) Art. 93, § 305 C provided:

> "All rents, annuities, dividends and periodical

payments in the nature of income, payable under the provisions of any will, deed or other instrument executed after the first day of July, 1929, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportionable in respect of time accordingly, unless otherwise expressly stated by the instrument under which they are payable; but no action shall be brought therefor until the expiration of the period for which the apportionment is made."

In *Zell v. Safe Deposit & Trust Co.*, 173 Md. 518, 196 A. 298 (1938), our predecessors concluded that the statute was not applicable to a cash dividend paid by a company which paid dividends irregularly, because the dividend was not declared in respect to some definite period of time. As a consequence, the life tenant was entitled to a dividend declared and paid after the death of a decedent. In *Heyn v. Fidelity Trust Company*, 174 Md. 639, 665-66, 1 A. 2d 83, 90 (1938), the Court went even further, and held that the payment of dividend arrearages on a cumulative preferred stock from current earnings was an extraordinary distribution not governed by any fixed period of time, and therefore was not within the contemplation of the statute.

In 1939, in an endeavor to adopt the so-called Massachusetts Rule as regards the allocation of stock dividends, to be considered hereafter, by Chapter 580, § 1 of the Laws of 1939, Maryland enacted the Uniform Principal and Income Act (the Uniform Act), Code (1957), Art. 75 B. Section 5 (1) provided that all dividends on shares held as principal are to be deemed principal if paid in the shares of the issuing corporation. The Uniform Act, by its terms, was not applicable to successive estates or interests created by the will of a testator dying before 1 June 1939. *See Lindau v. Community Fund of Baltimore*, 188 Md. 474, 478, 53 A. 2d 409, 411 (1947). By Chapter 581 of the Laws of 1939 Art. 93, § 305 C, the 1929 apportionment statute, was prospectively repealed.

In 1965, the General Assembly enacted the Revised

Uniform Principal and Income Act (the Revised Act) by Chapter 877, § 2 of the Laws of 1965 (Code, 1969 Repl. Vol.) Art. 75B. Section 6 (a) flatly provides that stock splits or dividends are to be considered principal, subject to the condition, however, that the provision is not applicable "to successive estates or interests in existence prior to June 1, 1965, in which the life tenant is entitled to *stock dividends* representing earnings during the life tenancy." (Emphasis supplied.)

The infant remaindermen would have us read the Revised Act as mandating the retention in the principal of the Ernst trust, of the 1970 distribution of the Company's stock. They reach for the language of the Revised Act as for a talisman, relying on the notion that because the Company characterized the 1970 stock distribution in its published material as a split, the courts of this State would conclude that the Revised Act permits only stock dividends to be allocated to income beneficiaries of pre-1965 trusts. We read the proviso quite differently. To us a fair reading of it is that a life tenant under a will in existence prior to 1 June 1965, irrespective of the provisions of the Revised Act, remains entitled to stock dividends representing earnings during the life tenancy, if he is entitled to the dividends either under the rule of our cases as it existed prior to the adoption of the Revised Act or under the provisions of Code (1935 Supp.) Art. 93, § 305 C.[9] The failure of the proviso to mention stock splits is of no consequence, because a life tenant never was entitled, under prior law, to stock received in consequence of a true split.

The problem here is that saying it is a split does not make it so. In our perhaps overly simplistic view, a split, by whatever name it may be called, is a distribution involving no change whatsoever in the capital account, *McCormick v. Frisch*, 199 Md. 181, 185-86, 85 A. 2d 793, 794-95 (1952), while

---

**9.** Chapter 877, § 3 of the Laws of 1965 specifically revived Art. 93, § 305 C, which had been repealed prospectively by Chapter 581 of the Laws of 1939, to the end that it shall be applicable to interests not governed by the Revised Uniform Principal and Income Act.

a stock dividend, by whatever name it may be called, does involve a transfer of accumulated earnings to the capital account.[10] Admittedly, a transfer of funds to the capital stock account partly from capital surplus and partly from earned surplus may bring into the picture the limitations recognized in *Donaldson* and *Apponyi.*

If we were writing on a clean slate, it might well be that we would reach a result different from that reached by the chancellor. An examination of our cases clearly shows the gradual development of the rule applied in *Donaldson* and in *Apponyi.*

In the first case, *Thomas v. Gregg,* 78 Md. 545, 28 A. 565 (1894), our predecessors rejected the Massachusetts Rule that cash dividends constitute income while dividends paid in stock are allocable entirely to principal, a rule first delineated in *Minot v. Paine,* 99 Mass. 101 (1868). Instead, Maryland adopted the Pennsylvania Rule enunciated in *Earp's Appeal,* 28 Pa. 368 (1857), which allocated to life tanants that portion of a stock dividend which represented the capitalization of earnings accumulated since the inception of the trust. The jurisdictions which respectively follow the Massachusetts and Pennsylvania Rules are identified in Annotation, 44 A.L.R.2d 1277, § 6 at 1292-97 (1955, Supps. 1969, 1974).

In *Thomas v. Gregg,* the Baltimore and Ohio Railroad Company declared a 20% stock dividend as a consequence of the capitalization of three years' earnings. The result reached in the case was that such of the stock as represented a capitalization of earnings prior to the creation of the trust estate was allocable to principal and the balance was treated as income, distributable to the life beneficiary.

There followed two cases dealing with extraordinary cash

---

**10.** *Compare* section B of Chapter 7 of Accounting Research Bulletin No. 43 of Accounting Principles Board of the American Institute of Certified Public Accountants; New York Stock Exchange Company Manual, "Stock Dividends" at A-235-36, "Stock Split-Ups" at A-255-57, which would seem to differentiate between a dividend and a split largely on the basis of the intention and purpose of the issuing company, *with* Machen, *The Apportionment of Stock Distributions in Trust Accounting Practices, supra,* 20 Md. L. Rev. 89, 90-92, which adopts a view similar to ours.

dividends. The first, *Quinn v. Safe Deposit & Trust Co.*, 93 Md. 285, 48 A. 835 (1901) allocated the dividend to income; the second, *Foard v. Safe Deposit & Trust Co.*, 122 Md. 476, 89 A. 724 (1914) allocated it entirely to principal. These cases are only superficially reconcilable and seem wholly at variance with the apportionment concept developed in *Thomas v. Gregg.*

*Thomas v. Gregg* was followed in *Atlantic Coast Line Dividend Cases*, 102 Md. 73, [*Safe Deposit & Trust Co. v. White,*] 61 A. 295 (1905); in *Coudon v. Updegraf,* 117 Md. 71, 83 A. 145 (1911); in *Northern Central Dividend Cases*, 126 Md. 16, 94 A. 338 (1915), and in *Miller v. Safe Deposit & Trust Co.*, 127 Md. 610, 96 A. 766 (1916). Only the last two cases clearly involve the capitalization of accumulated earnings.

*Baldwin v. Baldwin,* 159 Md. 175, 150 A. 282 (1930) involved a 100% stock dividend which was supported by a transfer to capital of undivided profits. The Baldwin court added to the Maryland rule that only shares issued as a result of the capitalization of earnings realized since the inception of the trust are distributable to income beneficiaries, a new concept, derived from *Matter of Osborne,* 209 N. Y. 450, 103 N. E. 723 (1913), that what the Court called the "intrinsic" value of the original investment must be protected by an apportionment between principal and income. This was the root of the "intake" value test developed by Mr. Pausch, sometimes also referred to as the "intact" value.

The last of the cases prior to *Donaldson* was *Lindau v. Community Fund of Baltimore, Inc., `supra,* 188 Md. 474, which was not controlled by the Uniform Act, but instead by a specific provision of the deed of trust:

> ". . . all stock dividends to the extent that they are paid out of current earnings for the current fiscal or preceding year shall likewise be treated as income as of the date of their payment; but all other stock dividends shall be treated as corpus of the trust estate."

The Court had no difficulty in ruling that a 20% stock dividend paid by the Fire Association of Philadelphia was apportionable to the extent necessary to keep intact the book value of the shares held by the trust.

The rule which may be distilled from the cases which are not controlled by either the Uniform Act or the Revised Act, simply stated, is this: if a distribution involves the capitalization of earnings generated between the inception of the trust and the effective date of the distribution, regardless of whether the distribution is characterized as a split or as a stock dividend by the issuer, the stock which is the subject of the distribution must be allocated to the income beneficiary of the trust to the extent first, that it represents a capitalization of earnings accumulated and undistributed since the inception of the trust; second, to the extent that the allocation effects no diminution of the adjusted historic book value of the stock remaining in the trust estate, *i.e.*, book value of the remaining stock, per the books of the issuing company at the time the allocation is made must exceed the "intake" book value.

Admittedly, the thread which runs through the cases has on occasion been frayed, *see Quinn v. Safe Deposit & Trust Co., supra,* 93 Md. 285 and *Foard v. Safe Deposit & Trust Co., supra,* 122 Md. 476, yet it remains viable as to trusts created prior to the enactment of the Uniform Act in 1939.

The remaindermen make much of the fact that Pennsylvania itself attenuated the Pennsylvania Rule in *In re Cunningham's Estate,* 395 Pa. 1, 149 A. 2d 72 (1959) and in *In re Harvey's Estate,* 395 Pa. 62, 149 A. 2d 104 (1959), both of which were decided on the same day: just five months before this Court decided *Apponyi.* Both *Cunningham* and *Harvey* were discussed in the appellant's brief in *Apponyi,* and as a consequence, were before the Court. *Cunningham* was particularly apposite because it held that the 1954 split of the stock of the General Electric Company was not an apportionable event — a distribution which *Apponyi* held to be allocable in part to the income beneficiary.

*Cunningham* dealt not only with the distribution of the

General Electric stock, but also with a distribution of Gulf Oil Corporation stock, both stocks having been purchased by the trust estate. The lower court had regarded each distribution as an apportionable event and directed that the proportion of each distribution which was supported by a transfer from earned surplus to capital be paid to the income beneficiary. In reversing the decree, the Pennsylvania court said, 395 Pa. at 14, 149 A. 2d at 79:

> "This Court, which created the Rule, should be the first to acknowledge its unworkability, inconsistencies and inequities in many instances under modern economic conditions. Parental defense of a child is justified only to the extent that the child's conduct is defensible."

The *Harvey* case involved distributions on stock of the Girard Trust-Corn Exchange Bank, General Electric Company, and Insurance Company of North America, the latter two holdings having been owned by the decedent. The lower court had held all three distributions to be apportionable. Relying on *Cunningham*, the Supreme Court of Pennsylvania held that of the three distributions, only that made by General Electric was not an apportionable event. The obvious answer to the appellants' contention is that the new approach taken by the Pennsylvania court was before our predecessors in *Apponyi*, and they remained unpersuaded. So do we.

Finally, the infant appellants would have us hold that the portion of the stock dividend of 56,000 shares properly distributable to the life tenants should be limited to 3,636.36 shares (a figure arrived at by dividing $56,000.00, the amount transferred from earned surplus to capital to support the issuance of the additional shares to the Ernst trust, by $15.40, the book value of each share of the Company's stock after the distribution). The short answer to this contention is that it is strongly reminiscent of (but more generous than) the New Jersey Rule, that the life tenant is limited to the dollar amount of earned surplus capitalized, that is to say, entitled to no more than the number of shares

which, at fair market value, equals the number of dollars transferred from earned surplus to capital. This was urged on our predecessors in the *Northern Central Dividend Cases*, *supra*, 126 Md. at 30, and rejected. It was rejected again in *Mercantile-Safe Deposit and Trust Company v. Apponyi*, *supra*, 220 Md. at 281, where Judge Hammond, for the Court, said at 285:

> "The *Baldwin* case, the *Heyn* case, the *Lindau* case, and the *Donaldson* case settled the Maryland law that dollar book value is the measure of impairment of corpus, and we shall not unsettle it."

We fully appreciate that the rule of our cases may be ill-suited to the modern mechanisms of corporate finance and may ignore the realities of an inflationary economy, but it seems to us that certainty, in this field, is to be preferred over flexibility. The case calls to mind the comment of Mr. Justice Brandeis in *Burnet v. Coronado Oil & Gas Co.*, *285 U. S. 393, 406 (1932)*:

> "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right."

This is particularly true in areas where corrective action can be taken prospectively by the legislature, as the General Assembly did in 1965 when it enacted the Revised Act.

> *Decree affirmed, costs below and on appeal, including the reasonable compensation of counsel for the trustee, for the infant appellants and for the unknown defendants together with their expenses, to be paid from the principal of the trust estate in the hands of the trustee.*

*Eldridge, J., dissenting:*

I respectfully dissent.

As the opinion of the Court notes, the market value of the assets of the Ernst trust as of April 1973 was $13,646,554. The effect of the majority's decision is to reduce the corpus of the trust from $13,646,554 to $7,654,554. This amounts to a 44% reduction in the value of the corpus. Such a result, to borrow the language of the chancellor, is "bizarre." More than that, it is inconceivable to me that the testator would have intended or desired such a diminution in the trust assets.

Assuming, *arguendo,* that under principles of *stare decisis* the result reached by the majority would be compelled by our pre-1965 decisions, the General Assembly, in enacting the Revised Uniform Principal and Income Act in 1965, Maryland Code (1969 Repl. Vol.), Art. 75B, § 6 (a), abrogated the effect of those decisions with respect to a stock distribution as we have here. Section 6 (a) of Art. 75B provides in pertinent part:

> "Corporate distributions of shares of the distributing corporation (whether or not of the same class), including distributions in the form of a stock split or stock dividend, are principal but the provisions of this subsection shall not apply to successive estates or interests in existence prior to June 1, 1965, in which the life tenant is entitled to stock dividends representing earnings during the life tenancy."

Section 6 (a) thus adopts the so-called "Massachusetts rule" by providing that all stock distributions, whether in the form of stock splits or stock dividends, become part of the corpus of the trust. The only exception, as the majority opinion recognizes, is for estates or interests previously in existence "in which the life tenant is entitled to *stock dividends* representing earnings during the life tenancy." (Emphasis supplied.) The critical issue, therefore, is what did the General Assembly mean by the term "stock

dividends." If a particular stock distribution to a pre-1939 trust does not constitute a "stock dividend" within the contemplation of the Legislature when it used that term, then the distribution must be allocated to principal and does not become a windfall to the income beneficiaries.

The majority opinion, citing *McCormick v. Frisch*, 199 Md. 181, 185-186, 85 A. 2d 793, 794-795 (1952), states that the term "stock split" means a distribution involving no change in the capital account whereas the term "stock dividend" involves a transfer of accumulated earnings to the capital account. In my view, however, the two terms as used in our cases had no such fixed definitions.

It is true that the cases in this Court, applying the so-called "Pennsylvania rule," have held that a stock distribution not supported by accumulated earnings should be allocated to the corpus of a trust while a stock distribution representing the capitalization of accumulated earnings since the beginning of the trust, or since the acquisition of the original stock, should be treated as income. However, the cases have not consistently defined the former situation as being a "stock split" and the latter situation as being a "stock dividend." Although the *McCormick* case may seem to support these definitions, other cases do not. Many of this Court's opinions appear to have used the term "stock dividend" to encompass both situations. *See, e.g., Lindau v. Com. Fund of Balto.*, 188 Md. 474, 478, 53 A. 2d 409 (1947); *Baldwin v. Baldwin*, 159 Md. 175, 181, 150 A. 282 (1930); *Northern Central Dividend Cases*, 126 Md. 16, 27-29, 94 A. 338 (1915); *Coudon v. Updegraf*, 117 Md. 71, 80, 83 A. 145 (1911). On the other hand, in both *Mer.-Safe Dep. Co. v. Apponyi*, 220 Md. 275, 280, 152 A. 2d 184 (1959) and *Donaldson v. Mer.-Safe Dep. Co.*, 214 Md. 421, 424-431, 135 A. 2d 433 (1957), certain stock distributions supported by accumulated earnings were described as "stock splits." In *Apponyi*, the Court described the American Gas & Electric Company distribution which had been involved in *Donaldson* as a "stock split," and the Court went on to state that the *"Donaldson* case es-

tablished that where surplus is capitalized and paid over as a *stock split*, the life tenant is entitled to the proportion of the new stock that represents surplus earned during the trust." (Emphasis supplied, 220 Md. at 280.) In *Donaldson*, the Court throughout its opinion referred to certain distributions supported in part by accumulated earnings as "stock splits."

Thus, as the appellees acknowledge in their brief in the instant case, the terms "stock split" and "stock dividend" had no clear fixed meanings in our case law prior to 1965. Consequently, it cannot be validly contended that the Legislature, when it used the words "stock dividend" in 1965, meant to embody any particular definition of the term previously established in Maryland law.

Absent any clear and consistent definition of the term "stock dividend" in our pre-1965 case law, and absent any legislative history regarding the meaning of the term in the Revised Uniform Principal and Income Act adopted in 1965, established principles of statutory construction dictate that the 1970 Proctor & Gamble stock distribution be considered a "stock split" and not a "stock dividend" within the meaning of the statutory language.

As this Court has repeatedly stated, a statute must "be construed according to the ordinary and natural import of the language used," *Grosvenor v. Supervisor of Assess.*, 271 Md. 232, 237-238, 315 A. 2d 758 (1974). *See also Radio Communications, Inc. v. Public Service Commission*, 271 Md. 82, 93, 314 A. 2d 118 (1974); *Chillum-Adelphi Volunteer Fire Dept., Inc. v. Prince George's County*, 269 Md. 486, 491, 307 A. 2d 481 (1973); *Scoville Service, Inc. v. Comptroller of the Treasury*, 269 Md. 390, 395, 306 A. 2d 534 (1973); *Giant of Maryland, Inc. v. State's Attorney for Prince George's County*, 267 Md. 501, 511-512, 298 A. 2d 427 (1973), *appeal dis.*, 412 U. S. 915, 93 S. Ct. 2733, 37 L.Ed.2d 141; *Baltimore County v. White*, 235 Md. 212, 218, 201 A. 2d 358, 360 (1964). The "ordinary and natural" meaning of the language "stock dividend" when in 1965 the Maryland Legislature enacted § 6 (a) of Art. 75B, would not embrace a stock distribution of

the type here involved. Rather, the Proctor & Gamble distribution would be regarded as a "stock split."

The Accounting Principles Board of the American Society of Certified Public Accountants, in Section B of Chapter 7 of Accounting Research Bulletin #43, has defined the terms "stock dividend" and "stock split" as follows:

> "1. The term *stock dividend* as used in this chapter refers to an issuance by a corporation of its own common shares to its common shareholders without consideration and under conditions indicating that such action is prompted mainly by a desire to give the recipient shareholders some ostensibly separate evidence of a part of their respective interests in accumulated corporate earnings without distribution of cash or other property which the board of directors deems necessary or desirable to retain in the business.

> "2. The term *stock split-up* as used in this chapter refers to an issuance by a corporation of its own common shares to its common shareholders without consideration and under conditions indicating that such action is prompted mainly by a desire to increase the number of outstanding shares for the purpose of effecting a reduction in their unit market price and, thereby, of obtaining wider distribution and improved marketability of the shares."

*See also* the New York Stock Exchange Company Manual, §§ A13 and A14, at A-235, A-255-256; Machen, *The Apportionment of Stock Distributions in Trust Accounting Practice*, 20 Md.L.Rev. 89, 90-92 (1960) (classifying stock distributions in three categories, namely a "stock dividend," a "true stock split" and a "modern stock split.")

As the record in the instant case shows, Proctor & Gamble's purpose in distributing the subject stock was to double the number of authorized shares, to change each of the "presently issued shares of common stock into two

shares," and to effect a corresponding reduction in the market price so that the stock would be more marketable. The notice sent by the company's board of directors stated that the "split of the outstanding shares of the common stock will result in no change in the relative rights or interests of the present shareholders." The transfer from earned surplus to the capital account of $1.00 per share was a purely nominal transfer, which was required by Ohio law. As appellants point out, the amount of the transfer from earned surplus was only $1/15$ of the book value of the new shares and less than $1/50$ of their market value.

The majority opinion states that merely because Proctor & Gamble characterized this distribution as a stock split "does not make it so." However, we have much more here than the company's characterization. The "ordinary and natural meaning" of the terms, in the real world of today, requires that this distribution be regarded as a "stock split" and not a "stock dividend."

Moreover, even if the normal meaning of the term "stock dividend" in § 6 (a) of Art. 75B were less clear, the result should be no different. Section 6 (a) of the Revised Uniform Principal and Income Act represents a legislative policy that all stock distributions should be allocated to principal and not income. Section 13 of the same Act expresses the policy that the statute should be applied to trusts in existence prior to the effective date of the statute.[1] The provision dealing with "stock dividends" to previously existing trusts represents an exception to the legislative policy embodied in the statute. As such, the exception for "stock dividends" should be given the narrowest scope reasonably possible.

---

1. Art. 75B, § 13, provides:

"Except as otherwise specifically provided in this article or in the trust instrument, will or other controlling document, this article shall apply to any receipt or expense received or incurred on or after the effective date of this article by any trust or decedent's estate or in connection with any legal life estate, whether established on, before or after the effective date of this article and whether the asset involved was acquired by the trustee, personal representative or life tenant on, before or after the effective date of this article."

Where a general policy is embodied in a statute, exceptions to that policy are to be strictly and narrowly construed. *Piedmont & Northern Ry. Co. v. Interstate Commerce Com'n*, 286 U. S. 299, 311-312, 52 S. Ct. 541, 545, 76 L. Ed. 1115 (1932); *United States v. Scharton*, 285 U. S. 518, 521-522, 52 S. Ct. 416, 417, 76 L. Ed. 917 (1932); *Perdue v. St. Dep't of Assess. & T.*, 264 Md. 228, 232-233, 286 A. 2d 165 (1972); *Johns v. Hodges*, 62 Md. 525, 537 (1884); 73 Am.Jr.2d, *Statutes* § 313.

Finally, it is a settled rule of statutory construction that "[a] construction of a statute which produces an unreasonable or illogical result should be avoided wherever it is possible to do so consistent with the statutory language." *Grosvenor v. Supervisor of Assess., supra*, 271 Md. at 242. Or, as we have also recently phrased it, "[i]n construing statutes, results that are unreasonable or inconsistent with common sense should be avoided whenever possible." *Giant of Md. v. State's Attorney, supra*, 267 Md. at 514. The Court's interpretation of the statute today shrinks the corpus of the trust by 44%. The chancellor described this result as "bizarre." The majority of the Court acknowledges that, if writing upon a clean slate, the Court might come to a different decision, and that the result reached "may be ill-suited to the modern mechanisms of corporate finance and may ignore the realities of an inflationary economy." However, given two reasonably possible constructions of a statute, we should adopt the one which does not produce "bizarre" results, which is suited to the modern mechanisms of corporate finance, and which does not ignore the realities of an inflationary economy.

Judges Levine and O'Donnell authorize me to state that they concur in the views expressed herein.