# RADIO COMMUNICATIONS, INC. *v.* PUBLIC SERVICE COMMISSION OF MARYLAND ET AL.

[No. 128, September Term, 1973.]

*Decided January 30, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, ■ SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Henry F. Leonnig* for appellant.

*Jess Joseph Smith, Jr., Special Counsel,* for Public Service Commission of Maryland, one of appellees. *Louis B. Thalheimer,* with whom were *Calhoun Bond* and *Cable, McDaniel, Bowie & Bond* on the brief, for Intervenors, other appellees.

LEVINE, J., delivered the opinion of the Court. BARNES and DIGGES, JJ., concur in part and dissent in part and BARNES, J., filed an opinion concurring in part and dissenting in part in which DIGGES, J., concurs at page 96 *infra.*

Although shrouded in a mass of technical evidence dealing with the complex subject of mobile radio communications, the primary question presented by this case is simply one of legislative intent. This appeal is brought by Radio Communications, Inc. (RCI) — a "radio common carrier" — from an order of the Circuit Court for Prince George's County affirming a decision of the Public Service Commission of Maryland (the Commission), one of several appellees. The remaining appellees (the intervenors) are also radio common carriers who initially entered this case by intervening in the proceedings before the Commission.

Prior to July 1, 1971, radio common carriers were not

regulated in the State of Maryland. In that year, the General Assembly enacted Chapter 543 of the Laws of 1971 — the source of this controversy — which brought companies engaged in that field of communications under state regulation for the first time. This resulted in dual control, since the medium had already been under the jurisdiction of the Federal Communications Commission (FCC) prior to 1971.

Chapter 543 achieved a threefold purpose, all within the framework of Maryland Code (1957, 1973 Cum. Supp.) Art. 78. First, it amended § 2 (o) of Art. 78, so as to embrace "radio common carrier[s]" within the definition of " 'public service compan[ies].' " Second, it added a subsection (ii) to § 2, defining a " 'Radio common carrier' " as:

> ". . . every public service company operating or managing a radio common carrier engaged in the business of providing a service of one-way or two-way radio communications and licensed as a miscellaneous common carrier by the Federal Communications Commission, but not engaged in the business of providing a public land line message telephone service or a public message telegraph service. The terms 'telegraph company,' 'telephone company,' or 'a person operating telegraph or telephone lines' when used in this article, shall not be construed to include radio common carriers."

Third, Chapter 543 added § 55A to Art. 78. This is the vehicle by which such carriers were for the first time brought under state regulation. Since they are material to the disposition of this case, we repeat here subsections (a), (b) and (d) of § 55A:

> "(a) *When certificate required; rules and regulations.* — No radio common carrier shall begin or continue the construction or operation of any radio common carrier system or any extension thereof, either directly or indirectly, without first obtaining from the Commission a certificate that the public convenience and necessity required such

construction, operation or extension. However, this article shall not require nor shall it be so construed to require any carrier to secure a certificate for any of the following:

"(1) An extension within any authorized service area within which the carrier has heretofore lawfully commenced operations, (2) any extension within or to territory already served by the carrier, necessary in the ordinary course of business, (3) substitute facilities within or to any authorized service area or territory already served by such carrier, (4) any extension into territory contiguous to that already served by the carrier and not receiving similar service from another carrier when no certificate of convenience and necessity has been issued to or applied for by any other radio common carrier, and (5) the acquisition, construction and operation of any plant or system heretofore constructed under authority of a certificate of convenience and necessity hereafter issued. The Commission is authorized to prescribe appropriate and reasonable rules and regulations governing the issuance of the certificates.

"(b) *Certification of carriers licensed by Federal Communications Commission.* — Any company not presently franchised or certificated by the Commission as a radio common carrier but engaged in the operation of any radio common carrier system licensed by the Federal Communications Commission on July 1, 1971, shall, upon qualification as a public service company receive a certificate of convenience and necessity from the Commission authorizing the company to continue the operation of the radio common carrier in the territory *professed to be served* by that company on July 1, 1971, if, within ninety days after this act becomes effective, that company shall file with the

Commission an application for the certificate, including copies of any license or licenses issued by the Federal Communications Commission to that company, showing the area *professed to be served* by that company.

\* \* \*

"(d) *Duplication of or competition with existing services.* — The Commission shall not grant a certificate for a proposed radio common carrier operation or extension thereof into the established service area which will be in competition with or duplication of any other certificated radio common carrier unless it shall first determine that the existing service is *inadequate to meet the reasonable needs of the public* and that the carrier operating the same is unable to, refuses or neglects, after hearing on reasonable notice, to provide reasonably adequate service." (emphasis added).

\* \* \*

The evidence discloses that mobile radio communications is a rapidly expanding branch of the communications field. Essentially, radio common carriers provide a mobile communications service, either by two-way transmission or one-way signalling. They operate base stations at which are located transmitters and receivers. The control point or message center, however, is the actual hub of the operation. The carrier operates its transmitters and receivers on channels or frequencies assigned by the FCC within a band allocated for that purpose. In Maryland, there are only two instances of co-channels, an arrangement under which a single radio frequency is shared by two or more radio common carriers. RCI participates in one of those co-channels. They are permitted by the FCC when agreed to by the participants.

Those who subscribe to a mobile communications service purchase or lease a mobile radio set, which may include a transmitting and receiving device for two-way communications or simply a receiver if only a one-way signalling service is desired.

Prior to 1971, radio common carriers were regulated only if they provided services utilizing "interconnections" with "land line" telephone systems. The most frequently cited illustration of how this interconnection operates is the placement of a call from a subscriber's office to one of its mobile units in the field. The caller, by a regular telephone call, reaches the control point operated by the radio common carrier, which then completes the call to the mobile unit by radio. Although there are calls made completely by radio, for example, from one mobile unit to another, it is apparent that the "interconnection" with regular telephone systems is the most prominent phase of this communications field.

It is this interconnection with land line telephone systems that first brought radio common carriers under limited scrutiny of the Commission. Even prior to 1971, radio common carriers were required to obtain Commission approval of services utilizing such interconnections. Thus, shortly after its formation in 1960, RCI applied to the Commission for the right to exercise its "franchise" in the seven counties in which it was then operating as a radio common carrier: Anne Arundel, Calvert, Charles, Howard, Montgomery, Prince George's and St. Mary's. In March 1963, the Commission issued an order authorizing RCI "to exercise franchises and rights, including the franchise granted to the said company by its certificate of incorporation for the operation of a radio communications system in the State of Maryland . . . as and to the extent set forth and described in this proceeding." [1]

After Chapter 543 became effective, the Commission held a hearing on August 4, 1971, following which, pursuant to

---

1. This order is open to question, since the power to grant a franchise is a legislative function, Charles Co. San. v. Charles Util., 267 Md. 590, 598, 298 A. 2d 419 (1973); Cambridge v. Eastern Shore Public Service Co., 192 Md. 333, 339, 64 A. 2d 151 (1949), which may be granted only by the legislature or by a municipal corporation to which that power has been delegated, Charles Co. San. v. Charles Util., *supra;* Water Co. v. Baltimore County, 105 Md. 154, 162, 66 A. 34 (1907); and may neither be granted by the Public Service Commission, Charles Co. San. v. Charles Util.; Cambridge v. Eastern Shore Public Service Co., both *supra;* nor by the acceptance of its certificate of incorporation by the State Department of Assessments and Taxation, Charles Co. San. v. Charles Util., *supra.*

the authority expressly conferred by § 64 of Art. 78 and subsection (a) of § 55A, it promulgated by an order dated September 27, 1971, ". . . rules and regulations [effective September 29, 1971] governing the issuance of certificates of public convenience and necessity for radio common carriers under Section 55A . . . ." Pursuant to those rules and § 55A, RCI and other radio common carriers — including intervenors — promptly filed applications for certificates of public convenience and necessity.

In its application, RCI sought to exercise a franchise for the following political subdivisions of the state: the City of Baltimore and the counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Caroline, Dorchester, Frederick, Harford, Howard, Montgomery, Prince George's, Queen Anne's, Somerset, St. Mary's, Talbot, Washington and Wicomico. The intervenors took a rather dim view of this preemptive bid and, regarding it as a flagrantly expansionist move by RCI, leaped into the affray. Several hearings ensued, which were characterized by polemics on the part of the protagonists and admirable restraint on the part of the Commission. Thus, merely two witnesses managed to produce three substantial volumes of testimony.

The sole witness who testified for RCI was its president, Boyd King (King); and for the intervenors, John E. Dettra, Jr., (Dettra), a radio engineer. Since most of this evidence is not material to the disposition of this appeal, no useful purpose could possibly be served by an extensive summary of the testimony. Indeed, because of its highly technical nature, merely undertaking a limited review presents a formidable task.

In brief, King testified that RCI operated five base stations on July 1, 1971, two at Bethesda, and one at each of the following sites: Prince Frederick, Upper Marlboro, and Annapolis. For each of those locations, maps were introduced with circles depicting the area in which RCI transmitted and received radio communications to and from mobile units. King emphasized that these circles were drawn on the basis of where RCI could "put" a signal and could communicate with mobile units from the particular base

station encircled on the map. In this manner. RCI transmitted and received signals as a radio common carrier on July 1, 1971, in each of the 21 subdivisions for which it was seeking certification. King explained that RCI's operations had expanded from the seven counties approved in the telephone interconnection context by the 1963 Commission order, mainly because of its improved technical facilities. These consisted of a change from low to high power transmitters and significant increases in antenna height.

The role of the FCC in regulating radio common carriers was explained by King: He stated that the purpose of the FCC license issued to such carriers is limited to the approval of the construction and operation of transmitters and companion mobile units. In other words, the license simply confers authority to establish and operate a base station at a particular site. Once the license is issued, the FCC permits licensees to operate wherever their signal penetrates. In short, according to King, under the FCC license, the carrier may broadcast or receive within a territory defined solely by the capability of its equipment and antennae. An "effective signal" was described by King as one which permits the base station to reach by radio a subscriber in a mobile unit within the area designated on each of the maps.

Needless to say, intervenors vigorously dispute these claims; indeed, their entire approach to this case, including the testimony of Dettra, varies sharply from the premise on which RCI presented its case. Their position was ultimately adopted by the Commission in reaching its decision.

The gravamen of Dettra's testimony is a standard called the "reliable service area" of a radio common carrier. It is determined by a plotted contour line known as 37 DBU (decibel units); this delineates an area in which service is generally expected to have an average reliability of not less than 90 per cent. This standard originated in a study that is commonly referred to as the "Boese Report," prepared for the FCC in 1951 by one of its engineers.[2]

---

**2.** William C. Boese, A Summary of the Technical Factors Affecting the Allocation of Land Mobile Facilities in the 152 to 158 Megacycle Band (1951, rev. 1954).

This testimony by Dettra was accompanied by a series of maps on which are drawn the 37 DBU contours for each of the base stations operated by RCI. Dettra explained that under FCC policy, the base station of a radio common carrier is expected to be within the toll-free telephone area of the community which it serves, so that the subscriber and the public generally may gain access to the transmitter by non-toll telephone calls.

In sum, although the intervenors conceded that the effective range of the RCI transmitters might sporadically extend beyond the 37 DBU contour, Dettra's thesis was that beyond this area, the signal would not meet the 90% reliability test fostered by the FCC. For this reason, he testified, RCI cannot render "reasonably adequate" service in each of the entire 21 subdivisions for which it requests certification. He did concede that it could do so in parts of the counties of Dorchester, Frederick, Kent, Queen Anne's, Talbot and Wicomico, in addition to the seven counties which it had already served since 1963.

As we have indicated, the Commission basically adopted the test advanced by Dettra in passing its order of February 9, 1972. It ruled that it was required to grant "grandfather" rights under subsection (b) of § 55A to radio common carriers licensed by the FCC "where they were legally rendering service *adequate to meet the reasonable needs of the public* on the effective date of the Act." (emphasis added).

Thus, the Commission found:

\* \* \*

"(2) That for the sole purpose of establishing the reliable service area of a radio common carrier public service company pursuant to Section 55A of Article 78, the Commission should consider the FCC prescribed decibel contour of a company's station plus a deviation of five (5) statute miles beyond said contour.

"(3) That the Commission should consider the reliable service area so determined as the only area in which a Radio Common Carrier may render a

satisfactory service, free of electrical inference [sic] or competitive economic injury, subject to the following conditions:

"(a) service to existing customers *will not* be impaired by the service area so determined.

"(b) customers garaged in an area of overlap between two or more carriers *will have* the benefit of service from such carriers.

"(c) the service area should not in any way limit or restrict the carrier of radio communications by telephone.

"(d) the carriers should formulate a mutual agreement whereby the user of a mobile radio telephone who travels within a particular county or counties or throughout the State would not be restricted of normal communication.

"(4) That the reliable service area of Radio Communications, Inc., is as follows:

*In its entirety:*

Montgomery County
Calvert County
Prince George's County
St. Mary's County

*Portions of the following Counties in Maryland, in accordance with the delineations on maps which are on file with this Commission:*

Howard County
Anne Arundel County
Kent County
Queen Anne's County
Talbot County
Dorchester County
Charles County" (emphasis in original).

This order was affirmed on appeal to the circuit court which followed the lead set by the Commission in applying the "reasonably adequate service" standard contained in Art. 78, § 55A (*d*) to RCI's application, which, however, was

filed pursuant to § 55A (*b*). The court also took note of the Commission's "special type of expertise" and held that its decision was not "arbitrary, capricious or illegal."

The Commission's decision is attacked by RCI on these grounds:

(1) The first, and by far the primary, contention urged for reversal is that the Commission erred in ignoring the simple requirement set forth in (b) for "grandfather" carriers, "the territory professed to be served"; and instead engrafted upon subsection (b) the test contained in (d), which is applicable only to "proposed" carriers.

(2) Even assuming that the Commission applied the correct test, its decision is "unsupported by substantial evidence on the record considered as a whole" and is therefore arbitrary and capricious.

(3) That the Commission "erred in failing to award" RCI "the entire counties in which it was previously certificated."

(4) The Commission erred in "apparently" attaching certain conditions to the certificate which it did grant.

In the view we take of this case, it is necessary that we reach only the first issue.

In arguing that the Commission failed to interpret subsection (b) of § 55A correctly, and thus applied an improper test for a "grandfather" application filed thereunder, RCI maintains that it met the requirements of (b) by merely "professing to serve" the 21 subdivisions for which it sought a certificate. But it also contends that it actually proved it did serve those 21 subdivisions; and that this evidence was not contradicted.

The intervenors, on the other hand, argue not implausibly that the legislature never intended that a carrier seeking "grandfather" rights could obtain them by simply making a bald assertion that it "professed" to serve the area being sought. Yet, while acknowledging that this case is controlled by subsection (b), they also argue that, as set forth in (d) for *proposed* carriers, RCI should receive a certificate only for

those areas where it could provide service adequate ". . . to meet the reasonable needs of the public . . . ." Hence, they maintain, since the "reliable service area of a radio common carrier" — Dettra's test for meeting those "needs" — is established by the 37 DBU contour, RCI is not entitled to a certificate beyond those limits.

We think the disposition of this case lies between these respective contentions. Although we find ourselves lacking complete agreement with either position, we are of the view that the Commission — and, hence, the circuit court in affirming it — applied an incorrect standard, and thus erred in its interpretation of § 55A.

What the legislature intended as the standard for carriers seeking "grandfather" rights under § 55A (b) must be determined in the first instance by a careful examination of the statute itself, since the cardinal rule of construction is to ascertain and carry out the real legislative intention, *Scoville Serv., Inc. v. Comptroller*, 269 Md. 390, 393, 306 A. 2d 534 (1973); *Silberman v. Jacobs*, 259 Md. 1, 267 A. 2d 209 (1970); *Atlantic, Gulf v. Dep't of Assess. & T.*, 252 Md. 173, 249 A. 2d 180 (1969); *Equitable v. Insurance Comm'r*, 251 Md. 143, 246 A. 2d 604 (1968); and in ascertaining that intention, the Court considers the language of an enactment in its natural and ordinary signification, *Germenko v. Pub. Service Comm.*, 226 Md. 295, 301-02, 173 A. 2d 362 (1961); *Height v. State*, 225 Md. 251, 257, 170 A. 2d 212 (1961). Thus it is necessary and proper to construe a statute only when it is ambiguous and of doubtful meaning, *Scoville Serv., Inc. v. Comptroller, supra; Hunt v. Montgomery County*, 248 Md. 403, 237 A. 2d 35 (1968); *Falcone v. Palmer Ford*, 242 Md. 487, 219 A. 2d 808 (1966). If there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the legislature, *Scoville Serv., Inc. v. Comptroller, supra; Maryland Nat'l Bk. v. Comptroller*, 264 Md. 536, 287 A. 2d 291 (1972); *Atlantic, Gulf v. Dep't of Assess. & T., supra; Department v. Greyhound*, 247 Md. 662, 234 A. 2d 255 (1967); *Md. Medical Service v. Carver*, 238 Md. 466, 209 A. 2d 582 (1965).

It is immediately apparent that § 55A is a carefully

conceived statutory scheme for the regulation of all radio common carriers in Maryland. Likewise, it is plain that subsection (b) was intended to regulate the issuance of certificates to all such carriers who were "engaged in the operation of any radio common carrier system licensed by the Federal Communications Commission on July 1, 1971," otherwise known as "grandfather" carriers.

It is equally clear that those seeking certificates who do not meet the requirements of subsection (b) for "grandfather" status, must file an application as a "proposed" carrier under (d). Should a carrier be certificated under (b) and then be challenged by a "proposed" carrier asserting "inadequate" service on the part of the "grandfather" carrier, the standard in (d) must then be invoked.

It follows that the legislature, having opted for this dichotomy in the statutory scheme, intended entirely separate tests for certification under the two subsections. The statutory distinction would completely lose its significance if a carrier operating prior to July 1, 1971, were expected to meet the same standard as that confronting a "proposed" carrier.

By reading into subsection (b) the standard set forth in (d), the Commission erred in undertaking to insert words in (b) which, in our view, were deliberately omitted by the legislature. Construing a statute liberally and adding to it, by judicial fiat, a provision which the legislature did not see fit to include are not one and the same thing, *Real Estate Comm'n v. Phares*, 268 Md. 344, 348, 302 A. 2d 1 (1973); *Amalgamated Ins. v. Helms*, 239 Md. 529, 212 A. 2d 311 (1965). As a general rule, a court may not surmise a legislative intention contrary to the plain language of a statute, nor insert or omit words to make the statute express an intention not evidenced in its original form, *Amalgamated Ins. v. Helms, supra* at 535; see also *Pressman v. State Tax Commission*, 204 Md. 78, 102 A. 2d 821 (1954).

Therefore, in the absence of ambiguity, the Courts should, as a general rule, confine themselves to a construction of a statute as written, and not attempt, under the guise of construction, to supply omissions or remedy possible defects

in the statute, or to insert exceptions not made by the legislature, *Scoville Serv., Inc. v. Comptroller; Amalgamated Ins. v. Helms*, both *supra.* As so aptly stated by Justice Brandeis in *Iselin v. United States*, 270 U.S. 245, 251, 46 S. Ct. 248, 70 L. Ed. 566 (1926):

> ". . . What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function . . . ."

In addressing themselves to the question of what standard was intended by the legislature in enacting subsection (b), the parties have cited a number of our prior decisions involving appeals from the Public Service Commission, including several in which we have touched on the subject of "grandfather" rights in other categories. The difficulty which stems from relying upon those authorities is that in none of them were we dealing with statutory language similar to that confronting us here.

RCI claims it is sufficient for purposes of obtaining "grandfather" certification in the 21 subdivisions if it merely "professes" to serve them. Appellees argue, with considerable logic, that this would reduce the Commission's role in this proceeding to that of a "rubber stamp." We agree that while the standards in (d) do not apply, RCI must nevertheless do more than merely "profess" to serve. It contends, however, that it did so by proving that it had communicated with mobile units in the 21 subdivisions from one or more of its base stations; and that this testimony was not effectively disputed by any of the intervenors.

We read subsection (b) to say that those who assert "grandfather" status cannot obtain certification by merely "professing to serve" a given area or county. Subsection (b) provides for certification of a radio common carrier *"engaged in the operation* of any radio common carrier system . . . ." By obtaining certification, a carrier is expected ". . . to *continue the operation* . . . in the territory professed to be served . . . ." (emphasis added). Thus, when

the application of a subsection (b) radio common carrier professing to have served an area is challenged, that carrier must then prove that, in fact, it did serve that area, *i.e.*, that on July 1, 1971, it was "engaged in the operation" of a radio common carrier system in each subdivision for which certification is sought. As we have already held, that requirement may not be embellished with any other standard not found in the language of subsection (b) itself. All parts and sections of a statute must be read and considered together in arriving at the true intention of the Legislature since they form part of a general system or scheme. *Parker v. Junior Press Printing*, 266 Md. 721, 725, 296 A. 2d 377 (1972); *Height v. State*, 225 Md. 251, 257, 170 A. 2d 212 (1961); *Thomas v. Police Commissioner of Baltimore City*, 211 Md. 357, 361, 127 A. 2d 625 (1956); *State v. Petrushansky*, 183 Md. 67, 71, 36 A. 2d 533 (1944).

Although RCI did endeavor to furnish the proof required by (b), the Commission was preoccupied with the premise that the subsection (d) standard controlled. We think the case should be remanded to the Commission for further proceedings, including the introduction of such additional evidence as the Commission may require, in order that RCI may be afforded the opportunity of establishing in what areas it did actually provide service, and for which it seeks certification under subsection (b); and so that intervenors may have the opportunity to present contrary evidence. In so holding, we carefully refrain from expressing any opinion on whether the 37 DBU contour is a proper standard for "proposed" carriers seeking certification under subsection (d).

> *Order reversed; remanded for further proceedings before the Public Service Commission of Maryland; costs to be paid equally by appellees.*

*Barnes, J., concurring in part and dissenting in part:*

I concur with substantially all of the majority opinion and with the principles of law and supporting authorities cited in

it. Indeed, I only dissent in the conclusion reached by the majority in the last three paragraphs of its opinion and in that portion of the mandate which remands the case for further proceedings before the Public Service Commission.

In my opinion, the majority in its construction of subsection (b) has departed from the principles of statutory construction so ably and carefully articulated in its opinion by, in effect, *adding words* to that subsection which are not in it, *i.e.*, by striking out the period and adding at the end of the subsection the words "and in which it did actually provide service." As I see it, however, the language of subsection (b) is not ambiguous, so that there is no need for using the principles of statutory construction applicable in the event of ambiguity in the statutory language.

Judge Sybert, for the Court, stated in *Germenko v. Public Service Commission,* 226 Md. 295, 301-02, 173 A. 2d 362, 365-66 (1961) — cited in the majority opinion — involving a "grandfather" clause relating to contract carriers of flammable liquids in bulk:

> "The cardinal rule in the construction of statutes is to give effect to the intention of the legislature, and in determining that intention the Court considers the language of an enactment in its natural and ordinary signification, and, if there is no ambiguity on the face of it, there is no need for construction and the Court will give to the language used its apparent meaning."

Judge Sybert further aptly stated:

> "We might add that the interpretation contended for by appellants would require reading into the 1959 statute some such limiting words as 'carriers operating *under permit*'. However, courts are 'generally not at liberty to surmise a legislative intent contrary to the letter of the statute, or to indulge in the license of inserting or omitting words with the view of making the statute express an intent which is not evidenced in the original form'. *Tax Comm. v. Power Company,* 182 Md. 111, 116, 32 A. 2d 382 (1943)."

In subsection (b), the words "engaged in the operation" are followed by the words "of any radio common carrier system licensed by the Federal Communications Commission on July 1, 1971." There is no limitation on *how* the system is operated nor any provision in regard to the *extent* of its operation. There is no question whatever that RCI was "engaged in the operation" of a "radio common carrier system" and was "licensed by the Federal Communications Commission on July 1, 1971." It is qualified as a public service company, so that by the plain, clear and unambiguous language of subsection (b), it *"shall"*(emphasis added) receive a certificate of convenience and necessity from the PSC authorizing the company *"to continue the operation"* (emphasis added) of the carrier in the territory "professed to be served by that company on July 1, 1971 . . . ." The plain and ordinary meaning of the key word "professed" is "openly declared, avowed, acknowledged, or claimed," Webster's New International Dictionary 1975 (2d ed. 1944), and see Black's Law Dictionary 1375 (4th ed. 1951), defining "profess" as "[t]o make open declaration of, to make public declaration or avowal." See also 34 Words and Phrases, "Profess; Professedly," at 378-79. The words "by that company" following the words "professed to be served" clearly indicate to me that the profession is to be made *by the applying company* and there is no contention that RCI did not profess to serve the subdivisions mentioned by it in its grandfather application. "[P]rofessed to be served" does not mean that the company must show, as a condition precedent to obtaining the certificate, that it provided "satisfactory" or "reasonably adequate" service in the areas listed by it in its application. Doubtlessly, if the General Assembly had so intended, it would have used appropriate language to that effect as indeed, in effect, it did in subsection (d) of Section 55A of Art. 78. As *Germenko* plainly teaches, we are not permitted to supply any additional words to the statute.

The language in subsection (b) in regard to the issuance of the certificate by PSC is mandatory — "shall" — and not permissive or discretionary. See 60 C.J.S. *Motor Vehicles* § 85(2), at 474 (1969) where it is stated:

"Unlike the granting of a certificate of public convenience and necessity in the ordinary case, as considered infra § 86, where applicant seeks a certificate as an existing carrier and complies with the requirements of the statute, the commission has no discretion to deny the certificate, but its powers and duties are ministerial and mandatory."

If RCI, after receiving its grandfather certificate of convenience and necessity, is unable to supply service which is adequate "to meet the reasonable needs of the public" in the areas it professes to serve, then appropriate proceedings by those aggrieved may be instituted under subsection (d) or under other appropriate provisions of Art. 78. It strikes me that this is a far wiser method of procedure than the one pursued by the PSC in this case and the one which it apparently will pursue as a result of the decision and remand by the majority. In the method of procedure which the statute envisions, as I believe the statute should be construed, the specific issues of the reasonable needs of the public in the particular area involved and the quality of the service may be explored in a specific area with definite persons aggrieved rather than in a most general proceeding employing a "shotgun" approach — a single trapeze act rather than a three-ring circus.

The difference is substantial and not merely a question of semantics. If it is required that questions of the quality of service and the reasonable needs of the public be considered in a post-grandfather certificate proceeding, the persons complaining of inadequate service will have the burden of coming forward with the pleadings and proof rather than the grandfather carrier. However, this burden, I fear, will come upon RCI as a result of the remand. To me, it is most incongruous that the grandfather carrier, by applying for a certificate under subsection (b), has immediately precipitated hearings and litigation as a condition precedent to receiving its certificate.

There is nothing unusual or unjust in a provision which gives a person or company operating first in a given field the advantage of his first position. Indeed, one of the principal

maxims of equity is *qui prior est tempore potior est jure* — he who is prior in time has priority in right. *See May v. Buckhannon River Lumber Co.*, 70 Md. 448, 450, 17 A. 274, 275 (1889) where Judge Yellott, speaking for the Court, after referring to the maxim, stated:

> "This maxim, though perhaps as old as our system of jurisprudence, is just as applicable now as when first promulgated by the English courts."

See *Co. Litt.* 14(a).

This incongruity is compounded, as it were, in view of the prior decisions of the Court in *Baltimore Tank Lines v. Public Service Commission*, 215 Md. 125, 137 A. 2d 187 (1957) and in *Germenko, supra,* which followed the decision in *Baltimore Tank Lines.* In short, the procedure which I think the General Assembly established in the legislation under consideration in the present case is quite analogous to procedures previously adopted by the General Assembly in prior legislation relating to grandfather situations. Our prior decisions and the clear meaning of subsection (b) are, like the old-time religion, good enough for me.

I would reverse, but I would not remand the case for further proceedings.

I am authorized to state that Judge Digges concurs in the views expressed in this dissent.