# ST. PAUL FIRE & MARINE INSURANCE COMPANY
## *v.* INSURANCE COMMISSIONER OF THE
## STATE OF MARYLAND ET AL.

[No. 10 (Adv.), September Term, 1975.]

*Decided June 2, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Thomas Waxter, Jr.,* and *Norman P. Ramsey,* with whom were *Alan N. Gamse* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*Francis B. Burch, Attorney General,* and *William J. Giacofci, Assistant Attorney General,* with whom was *Gerald Langbaum, Assistant Attorney General,* on the brief, for Insurance Commissioner of the State of Maryland and *John F. King, Frederick G. Savage* and *Anderson, Coe & King* on the brief, for Hilbert M. Levine.

LEVINE, J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 144 *infra.*

This appeal by St. Paul Fire & Marine Insurance Company (the company) is from an order of the Baltimore City Court (Liss, J.) affirming an order of the Insurance Commissioner of the State of Maryland (the commissioner), one of two appellees in this Court.

The order requires the company to "accept for renewal at currently applicable rates" the physicians' and surgeons'

liability insurance (medical malpractice) policy of Dr. Hilbert M. Levine, the other appellee. The order, as modified by the court below, also directs the company to continue accepting "the business of physicians' and surgeons' liability insurance in the State of Maryland, by receiving *all* new applications . . . , and by considering for renewal *all* outstanding policies for such insurance issued by the Company which have expiration dates on or after January 1, 1975 . . . ." (emphasis added). We granted a Writ of Certiorari and advanced the case for argument because of the important issues that are presented, and the critical circumstances that have developed in regard to medical malpractice insurance in Maryland.

Following the oral argument on March 21, 1975, we issued a per curiam order in which, after concluding that the statutory basis for the orders passed by the commissioner and the court below—Maryland Code (1957, 1972 Repl. Vol., 1974 Cum. Supp.) Art. 48A, § 234A — "[is] not applicable to the decision of the appellant-insurer to cease writing its entire line of medical malpractice insurance policies in this State," we ruled "that upon the filing of [this] opinion in [the] case, and the subsequent issuance of the Court's mandate," the order of the Baltimore City Court would be reversed with directions to cause the order of the commissioner to be vacated.

The company, a "multi-line" insurance carrier operating throughout the United States and in other countries, is authorized to do business in Maryland by virtue of a certificate of authority issued by the commissioner. In the late 1930's or early 1940's, it became one of the first insurers to market what is commonly referred to as medical malpractice insurance. In 1960, it commenced a special relationship with the Maryland Medical and Chirurgical Faculty (Med-Chi), whereby it became the sponsored insurer of its members for medical malpractice insurance. At that time, as is the case today, the company was one of approximately twelve writing such insurance in Maryland.

The sponsorship arrangement imports neither group

insurance nor a contractual relationship. The company simply commits itself to provide medical malpractice insurance to the members of Med-Chi, and each individual physician is issued a separately underwritten policy. Med-Chi merely agrees "to work with" the company in the areas of loss prevention and in the review and processing of claims. At the commencement of the relationship in 1960, the company wrote between 15 and 20 percent of medical malpractice insurance marketed in Maryland; by 1974, under the sponsorship arrangement, it had become the insurer for some 3,600 physicians, or approximately 85 percent of those practicing in the state.

With the advent of specialization and greater complexity in the practice of medicine have come increasing demands upon the insurance companies handling medical malpractice insurance. Claims adjusters and defense attorneys in this field must now possess a specialized expertise. Not surprisingly, therefore, these circumstances, together with other developments in medical malpractice litigation, have increased the underwriting risk of this form of coverage, and have reduced the national market to some 12 insurance companies.

As this case demonstrates, however, nothing reflects the impact of these trends more impressively than the dramatic rise which has occurred in the cost of such insurance in the last few years. In September 1973, the company filed a request for a rate increase of 59.7 percent which was denied on the following November 13. As the result of a conference between the commissioner and company representatives, an amended request for an increase of 45.9 percent was filed, which was granted effective January 4, 1974.

Reacting sharply to the action of the commissioner in paring its request, the company wrote to the executive director of Med-Chi that it could not continue to write medical malpractice coverage on what it characterized as "a net loss basis." After summarizing the efforts it had made to obtain rate relief, it predicted that the loss experience would continue "to deteriorate." Hence, an early request for

additional rate relief was likely. It concluded with this statement: "Should there be a lengthy delay in acting upon the 1974 rate increase, or if the request is denied, we will be unable to continue in our present capacity as the sponsored carrier in Maryland beyond 1974."

Subsequently, a request was made for an increase of 48 percent which was denied in May 1974. In rejecting this request, the commissioner assigned several reasons, the essence of which was that he disagreed with the actuarial procedures employed by the company in assembling its request. Further administrative and judicial review of the commissioner's action was not sought.

Upon the rejection of the rate increase, the company wrote to both the commissioner and Med-Chi on June 17, 1974, and announced that a new sponsored insurer should be sought, since it would "cease writing physicians and surgeons professional liability in Maryland by January 1, 1975." It promised "to provide [its] normal market until such time as a new sponsored carrier [was] designated by Med-Chi, or January 1, 1975, whichever occur[red] first."

On November 14, 1974, the company directed a "notice of non-renewal" to Dr. Levine in which he was advised that his two policies ("primary" and "excess" coverage), which were scheduled to expire on January 1 and 2, 1975, respectively, would not be renewed. In an accompanying explanation, the company summarized its unsuccessful efforts to obtain what it regarded as the necessary rate relief. The thrust of its position was that in its 13-year relationship with Med-Chi, it had incurred an alleged "deficit on this line of business in Maryland of nearly $10,000,000." Hence, it was compelled "to withdraw from Maryland for this line of business." At the same time, the company initiated a similar procedure of issuing notices to all of the physicians it insured in Maryland 45 days in advance of their respective expiration dates.

Upon a complaint being lodged with the commissioner by Dr. Levine, a hearing was scheduled which was held on December 20 and 23, 1974. The commissioner ruled that §

234A, as amended by chapter 752 of the Laws of 1974, was applicable, and that the company had not met its burden of persuasion to "demonstrate that the . . . refusal to underwrite or renew [was] justified . . . ." Consequently, he ordered the company to renew Dr. Levine's policies, and to "accept the business of Physicians' and Surgeons' liability insurance in the State of Maryland . . . at currently approved rates . . . ." In so ruling, the commissioner observed:

"The statute in question specifically limits the action of an insurer (or agent or broker) in making what is termed 'underwriting decisions' (refusal to write a risk or class of risk in the first instance, the cancellation of a risk or class of risk in midterm or the failure to renew a risk or class of risk at the end of a policy period), in three distinct areas. These include:

"1. Underwriting decisions based 'in whole or in part upon race, color, creed or sex of an applicant or policyholder.'

"2. Underwriting decisions based on 'any arbitrary, capricious, or unfairly discriminatory reason.'

"3. Underwriting decisions not based on 'standards which are reasonably related to the insurer's economic and business purposes.' "

He then found that the company had violated standards "2" and "3" in reference to both Dr. Levine, an individual risk, and the medical community as a whole, a class of risk. On appeal to the Baltimore City Court, as we noted earlier, the order of the commissioner was modified and, as modified, affirmed.

In this Court, the company advances these contentions:

1) Section 234A does not apply because the company has made a general business decision not to underwrite an entire category of insurance, rather than a specific decision involving only a "particular insurance risk or class of risk."

2) The company has met its burden of persuasion of showing its decision to have been by the application of standards which are reasonably related to its economic and business purposes.

3) That § 234A is unconstitutional.

Since we agree that the statute is inapplicable to this case, it is unnecessary for us to decide the remaining two points.

Section 234A was first enacted as chapter 417 of the Laws of 1970. In relevant part, it then prohibited any insurer from cancelling and refusing to underwrite or to renew "a particular insurance risk or class of risks for any arbitrary, capricious, unfair or discriminatory reason, based in whole or in part upon the race, creed, color, religion, national origin, or place of residency of an applicant or policyholder." From the very beginning, § 234A has been included in the subtitle of the insurance code labeled "Unfair Trade Practices."

By chapter 789 of the Laws of 1971, § 234A was repealed and re-enacted so as to provide in pertinent part: "(a) No insurer, agent or broker shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. . . ."

We considered § 234A, in light of the 1971 amendment, in *Insurance Comm'r v. Allstate Ins.*, 268 Md. 428, 302 A. 2d 200 (1973), where two automobile liability policies had been non-renewed, one because of a series of accidents and the other because of an accumulation of violations. In upholding a decision for the insurers, we said:

> "It is clear to us that the principal thrust of this legislation was directed toward any action of an insurer in failing to underwrite or renew a particular risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder for any arbitrary, capricious or unfairly discriminatory reason *like* those specifically mentioned, including, but not

restricted to, religion, national origin, place of residency or other similar irrelevant considerations. In short, the General Assembly intended to broaden the scope of 'arbitrary, capricious, or unfairly discriminatory reason,' but within the frame of reference of the specifically mentioned 'reasons.' " 268 Md. at 442 (emphasis in original).

Our decision in *Allstate* led directly to the enactment of chapter 752 of the Laws of 1974, which produced § 234A in its present form. Expressly referring to *Allstate* by name, the General Assembly in a preamble to the amended law recited its determination:

". . . that all underwriting decisions of insurers and insurance agents and brokers, with regard to both eligibility and acceptability of applicants for insurance and insureds, [should] be made solely on the basis of a reasonable application to relevant facts of underwriting principles, standards and rules that can be demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer . . . ."

The General Assembly also determined that the general welfare of the people "is insufficiently assured and inadequately promoted merely upon a showing by insurers . . . that their underwriting decisions" are not based on the historic prejudices such as "race, color, religion or creed, sex, national origin or place of residence and the like." Thus, it added the last two sentences to subsection (a) of § 234A. which now provides in relevant part:

"(a) No insurer, agent or broker shall *cancel or refuse to underwrite or renew a particular insurance risk or class of risk* for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. . . .

No insurer, agent or broker may *cancel or refuse to
underwrite or renew a particular insurance risk or
class of risk* except by the application of standards
which are reasonably related to the insurer's
economic and business purposes. At any hearing to
determine whether there has been a violation of
this section, the burden of persuasion shall be upon
the insurer to demonstrate that the cancellation, or
refusal to underwrite or renew is justified under
the standards so demonstrated." (emphasis added).

The company contends that it decided to withdraw
entirely from the medical malpractice insurance market in
Maryland because of "deteriorating" conditions in that line,
the unsympathetic regulatory climate, and the fact that it
had lost over $10,000,000 in that market and was continuing
to lose money. To demonstrate the accuracy of this
appraisal, it points to the fact that no other insurance
carrier has offered to furnish any of the coverage being
relinquished by the company.

In pressing its argument that § 234A is inapplicable, the
company maintains that the statute is aimed at individual
underwriting decisions involving "a particular risk or class
of risk," not at general policy decisions, made at the highest
corporate level, affecting a complete line of insurance such
as medical malpractice coverage. Thus, the company
contends that the words "risk or class of risk," within the
contemplation of § 234A, actually mean "person or class of
persons." This view, says the company, is consistent with
the statutory purpose "to provide for non-discriminatory
treatment of individual risks, and for equal treatment for
those risks falling within the same proper rating
classification." As the company sees it, therefore, it is free to
determine which line of insurance it will offer, but once it
elects to underwrite a category or line of insurance, the
statute requires that it not discriminate, without
justification, between persons or classes of persons.

The commissioner, on the other hand, concerned with
what he regards as a form of blackmail in the pursuit of

higher insurance rates, argues that the company cannot refuse to underwrite medical malpractice insurance in this state without showing the decision to be based on "standards which are reasonably related to the insurer's economic and business purposes." Although conceding that an insurer may withdraw from an entire line of insurance, he maintains that medical malpractice insurance is not an entire line, but merely a "class of risk" within the line designated "liability other than automobile"; and that an insurer, therefore, cannot discontinue underwriting medical malpractice insurance, without justifying its decision under § 234A, unless it withdraws from all "liability other than automobile." Thus, absent such a withdrawal or compliance with § 234A, the company must continue to underwrite medical malpractice insurance for an indeterminate period.

Essentially, then, the applicability *vel non* of § 234A turns upon the meaning of the words, "cancel or refuse to underwrite or renew a particular insurance risk or class of risk," as they are used in that section. As we have frequently said, the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent, *Md.-Nat'l Cap. P. & P. v. Rockville*, 272 Md. 550, 555, 325 A. 2d 748 (1974); *Radio Com., Inc. v. Public Serv. Comm'n*, 271 Md. 82, 93, 314 A. 2d 118 (1974); *Scoville Serv., Inc. v. Comptroller*, 269 Md. 390, 393, 306 A. 2d 534 (1973); *Silberman v. Jacobs*, 259 Md. 1, 267 A. 2d 209 (1970); and in ascertaining that intent, the Court considers the language of an enactment in its natural and ordinary signification, *Md.-Nat'l Cap. P. & P. v. Rockville, supra*, 272 Md. at 556; *City of Gaithersburg v. Mont. Co.*, 271 Md. 505, 511, 318 A. 2d 509 (1974); *Radio Com., Inc. v. Public Serv. Comm'n, supra*.

In deciding the meaning of the word "risk," as used in § 234A, the following statement from 12 Appleman, *Insurance Law and Practice*, § 7121, at 154-55 (1943), which we have quoted frequently, is apposite:

"In the absence of statute, it is purely voluntary on the part of the company as *to whom* it will insure, and it is under no duty to write insurance for any

particular *applicant.* The insurer is at liberty to choose its own *risks* and may accept or reject *applicants* as it sees fit." (emphasis added). *Gov't Employees Ins. v. Ins. Comm'r,* 273 Md. 467, 478, 330 A. 2d 653 (1975); *Insurance Comm'r v. Allstate Ins.,* 268 Md. 428, 441, 302 A. 2d 200 (1973); *Edelstein v. Nationwide Mut. Ins.,* 252 Md. 455, 462, 250 A. 2d 241 (1969).

This statement suggests that the word "risk," which is used synonymously with the words "whom" and "applicant," refers in this context to the person being insured. Similar use of the word was made in *Insurance Comm'r v. Allstate Ins., supra,* quoting from *Edelstein v. Nationwide Mut. Ins., supra,* 252 Md. at 461:

"It is well established in Maryland and generally that an insurance company has the unqualified right to select the *risks* it considers profitable to insure and the company is under no obligation to accept an insurance *application* submitted by its agent or broker. . . ." 268 Md. at 440 (emphasis added).

The language of the first sentence of § 234A itself suggests that "risk," as used in that section, was intended to mean person or applicant.

Clearly, then, the evil aimed at by the statute is discrimination against individuals or classes of individuals. When the Legislature added a new standard to § 234A in the 1974 amendment, it did so by inserting the identical language, "particular insurance risk or class of risk," immediately following the prior enactment. This must be regarded as a manifestation of intent that this phrase, as used in the amendment, should have the same meaning that it already had in the original statute. Section 234A, therefore, although now containing broader substantive standards, continues to be aimed at discrimination against individuals or classes of individuals.

The commissioner claims, however, that even if a

"particular insurance risk" means an individual person and a "class of risk" means a class of persons, the company must nevertheless renew the insurance for each physician unless it can comply with the standards of § 234A. In other words, despite its avowed departure from the entire line of medical malpractice insurance, the company is no less engaged at the same time in non-renewing Dr. Levine and each of the other individual physicians to whom it has sent similar notices. According to this view, the company's complete withdrawal from the medical malpractice market in Maryland, and the non-renewal of *all* of the 3,600 physicians it insures, does not relieve the company from compliance with § 234A. The company must justify the non-renewal of all of them. Under this interpretation, no insurer could ever refuse to offer any category of insurance to an individual applicant, even though it had previously never underwritten such coverage, without first complying with § 234A. This would follow because the statute refers to "cancel or refuse to underwrite or renew" collectively. Hence, it is directed not only at non-renewals and cancellations, but at refusals to underwrite, which the commissioner, in his own order below, defines as a "refusal to write a risk or class of risk *in the first instance.*" (emphasis added.)

Logically, then, the commissioner's interpretation would mean that *all* insurers could be required to underwrite any given line of insurance, since the statute makes no distinction between underwriting "in the first instance," and the non-renewal of existing policies. That no such result was intended is evident from the plain language of § 234A. The general rule is that the courts may not surmise a legislative intention contrary to the plain language of a statute, nor insert or omit words to make the statute express an intention not evident in its original form. Therefore, in the absence of ambiguity, the courts should, as a general rule, confine themselves to a construction of a statute as written, and not attempt, under the guise of construction, to supply omissions or remedy possible defects in these statutes. *Gov't Employees Ins. v. Ins. Comm'r, supra,* 273 Md. at 481-82; *Patapsco Trailer v. Eastern Freight.,* 271 Md. 558, 563-64, 318

A. 2d 817 (1974); *Radio Com., Inc. v. Public Serv. Comm'n, supra,* 271 Md. at 94-95; *Scoville Serv., Inc. v. Comptroller, supra.*

Furthermore, if the words "particular insurance risk," referring to each individual person no matter how many there are in the aggregate, could be applied in this manner to every case, as urged by the commissioner, then the phrase "or class of risk" would be completely superfluous. Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory. *A.H. Smith Sand & Gravel v. Dep't,* 270 Md. 652, 659, 313 A. 2d 820 (1974); *Baltimore City v. United Stores,* 250 Md. 361, 368-69, 243 A. 2d 521 (1968); *Thomas v. Police Commissioner,* 211 Md. 357, 361, 127 A. 2d 625 (1956).

In light of the evident purposes of § 234A, the words "particular insurance risk or class of risk" mean that the statute applies to decisions aimed at individual persons or classes of persons, but not to decisions, such as the one here, which concern an entire line of insurance. In short, an insurer may determine independently of § 234A whether it will underwrite a given line of insurance, but once it elects to do so, it must insure every individual or class of individuals desiring such insurance, or else justify its refusal under § 234A.

Lastly, the commissioner contends that an insurer can make such basic decisions to underwrite or not underwrite an entire line of insurance without being subjected to the scrutiny mandated by § 234A only if the specific market, such as medical malpractice coverage in this case, actually constitutes a "line" of insurance. By this, as we suggested earlier, he means that an insurer may withdraw from a line, but not a lesser category. The commissioner attributes to the word "line" a technical meaning. He claims that each of the categories listed on the certificate of authority which he issues to each insurer is a "line" of insurance. Medical malpractice insurance, according to the commissioner, is

merely a "class" of insurance within the "line" described as "liability other than automobile." Under this view, the company is free to withdraw from the medical malpractice insurance market — independently of § 234A — only if it also withdraws from the entire "line".designated as "liability other than automobile." This argument proves too much.

Were the statute to be read so as to require the company to justify its non-renewal of medical malpractice insurance, so long as it continued to underwrite all other "liability other than automobile" insurance, then the other companies writing the latter insurance in Maryland — approximately 300 in number — would also be compelled to justify their refusal to underwrite medical malpractice coverage. This result would follow, we think, from the meaning of the statutory language, "cancel or refuse to underwrite or renew," to which we referred earlier. In effect, the argument of the commissioner, if adopted, would ascribe to § 234A an intention to create an "assigned risk" plan, which even he concedes would require express statutory authority.

As we noted earlier, chapter 752 was a direct response to our decision in *Allstate*. There, we had held that despite the 1971 amendment, § 234A continued to be directed only at the historic prejudices enumerated in the first sentence of the statute or ". . . any arbitrary, capricious or unfairly discriminatory reason *like* those specifically mentioned . . . ." *Insurance Comm'r v. Allstate Ins., supra,* 268 Md. at 442 (emphasis in original). Consequently, the statute, as then written, did not apply to the two non-renewals being contested there, which were based on a series of automobile accidents and on an accumulation of traffic violations. The General Assembly, in its preamble to chapter 752, stated that "the general welfare of the people . . . is insufficiently assured and inadequately promoted" by such a limited statutory scheme. By 1974, a discernible pattern had emerged suggesting a tendency on the part of some automobile insurers to seize upon a given number of accidents or violations during the insurance term — sometimes as few as one — as the purported basis for

non-renewal. The Legislature was concerned that such underwriting policies might not be justified by the actual risk experience of those insurers. The 1974 amendment, therefore, was designed ". . . to correlate insurance acceptability with 'relevant facts of underwriting principles, standards and rules that can be demonstrated objectively . . . .' " *Gov't Employees Ins. v. Ins. Comm'r, supra,* 273 Md. at 483. Chapter 752, in short, was conceived to eliminate underwriting decisions of the kind which were challenged in *Allstate,* except when made by "the application of standards . . . reasonably related to the insurer's economic and business purposes."

In sum, as its placement under the subtitle "Unfair Trade Practices" also tends to suggest, § 234A is aimed at underwriting decisions which discriminate against an individual or a class of individuals, not at business decisions to withdraw from an entire line of insurance. Since the company has not discriminated against an individual physician or a class of physicians, that is, since its decision does not single out Dr. Levine or any other individual physician or class of physicians, § 234A does not apply. For these reasons, the complaints against the company should have been dismissed.

> *Judgment reversed; remanded to the Baltimore City Court with directions to vacate the order of the Insurance Commissioner of Maryland dated January 21, 1975; appellee, Insurance Commissioner, to pay costs.*

*Eldridge, J., dissenting:*

The majority concludes that § 234A of the Insurance Code [1] is "aimed at discrimination against individuals or classes of individuals." Yet the Court somehow also concludes that physicians seeking professional liability or

---

1. Maryland Code (1972 Repl. Vol., 1974 Supp.), Art. 48A, § 234A.

malpractice coverage do not constitute a class of individuals covered by § 234A. I would hold that medical malpractice coverage for physicians fits precisely in the term "class of risk" as used in § 234A.

This Court has once before taken a very narrow view of the scope of coverage of § 234A. In *Insurance Comm'r v. Allstate Ins.*, 268 Md. 428, 302 A. 2d 200 (1973), the Court held that an earlier version of § 234A was restricted to prohibiting discrimination only on the basis of factors such as race, religion, sex, national origin and place of residency. The legislative reaction to that decision was swift and decisive. The General Assembly enacted Ch. 752 of the Acts of 1974. The Legislature stated in the preamble of Ch. 752 that: "[T]he general welfare of the People of Maryland . . . is inadequately assured . . . merely upon a showing by insurers . . . that their underwriting decisions are made without reasons based . . . upon considerations as race, color, religion or creed, sex, national origin or place of residency and the like . . . ." The Legislature further determined that "the general welfare . . . requires that *all underwriting decisions* of insurers . . . be made solely on the basis of a reasonable application to relevant facts of underwriting principles, standards and rules that can be demonstrated objectively to measure the probability of a direct and substantial adverse effect upon losses or expenses of the insurer in light of the approved rating plan or plans of the insurer then in effect . . . ." (Emphasis supplied.) Ch. 752 amended § 234A of Art. 48A by adding the two sentences which appear at the end of subsection (a) as it now stands:

"No insurer, agent or broker shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policy-holder or for any arbitrary, capricious, or unfairly discriminatory reason. . . . No insurer, agent or broker may cancel or refuse to underwrite or renew a particular insurance risk or

class of risk except by the application of standards which are reasonably related to the insurer's economic and business purposes. At any hearing to determine whether there has been a violation of this section, the burden of persuasion shall be upon the insurer to demonstrate that the cancellation, or refusal to underwrite or renew is justified under the standards so demonstrated."

The intent of the Legislature, that "*all* underwriting decisions" be based on underwriting criteria having a reasonable relation to the insurer's economic and business purposes, is in conflict with the Court's limitation in this case of the applicability of § 234A. This is particularly troublesome in view of the Legislature's explicit broadening of the scope of § 234A in response to our decision in *Allstate.*

The majority's holding is based on an arbitrary denomination of medical malpractice coverage as being a "line of insurance" rather than a "class of risk." [2] In making this important choice of terms, the majority rejects the Insurance Commissioner's determination that medical malpractice is a "class of risk" within the line of insurance of "liability other than automobile." This is indeed a "technical" definition, as the majority labels it, which the Commissioner in the exercise of his expert judgment has made. When reviewing questions arising in a complex area such as the regulation of insurance, we should give significant weight to determinations made by expert administrative bodies. A. Davis, *Administrative Law* § 30.09, at 243 (1958). The majority offers no basis in law or fact for preferring their presumably nontechnical formula to the Commissioner's "technical" definition of a "line of insurance."

---

2. The majority make much of the fact that if physicians professional liability is seen as a class of risk, companies not writing it would have to justify their refusal to do so. This argument is a "strawman," however, since a company not writing such insurance need do no more than to state that it had determined that it has no economic or business reason to do so. Sec. 234A does not give the Insurance Commissioner authority to second guess the business decisions of insurance company officials.

If, as the majority suggests, § 234A is meant only to prevent discrimination against individuals as such or individuals who happen to be grouped together on the basis of their individual traits or accident records, then the phrase "class of risk" is essentially without meaning, except to represent the plural of "risk." The term "class of risk" must refer to more than just individuals who can be grouped together because they each represent a risk greater than other individuals receiving the same type of coverage. Logically, a "class of risk" should include all persons covered by a particular type of insurance. The majority's definition of "class of risk" would leave these persons at the mercy of insurers, so long as individuals within these groups were not discriminated against. For example, the majority's reasoning would apply § 234A to require a business purpose in the case where a pediatrician's coverage was cancelled while other pediatricians' coverage was not, but the majority's reasoning would deny application of § 234A where all pediatricians had their coverage cancelled, but all obstetricians continued to be covered, if the insurer merely labelled coverage of the pediatricians as a different "line of insurance" than coverage of obstetricians.[3]

---

3. That "class of risk" does not mean groups of individuals within a certain type of insurance coverage who possess a particular personal characteristic or accident record is indicated by § 242(c)(4) of Article 48A. Subsection (c)(4) of § 242 provides:

"Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. The standards may measure any difference among risks that can be demonstrated objectively to have a probable effect upon losses or expenses. . . ."

This provision, which allows rates to be based on certain characteristics of the insureds covered by a particular type of insurance, indicates that the Legislature did not intend the term "class of risk" in § 234A to have the meaning ascribed to it by the majority. If the Legislature had intended to convey the meaning claimed by the majority, it would have used instead the phrase "classification of risks" in order to make § 234A consistent with § 242 (c)(4). It is a fundamental rule that different parts of a statute should be construed in a manner making them consistent and harmonious, if possible. Coerper v. Comptroller, 265 Md. 3, 6, 288 A. 2d 187 (1972); Unsatisfied Fund v. Bowman, 249 Md. 705, 709, 241 A. 2d 714 (1968).

Therefore, I would hold that medical malpractice insurance is a "class of risk" within the meaning of § 234A. As § 234A by its clear terms applies to refusals to renew a "class of risk," the statutory provision is fully applicable in this case. Under § 234A, St. Paul has the burden of showing that its suspension of writing medical malpractice insurance was not arbitrary and was based on the application of standards which are reasonably related to its economic or business purposes. However, I would not hold, as the Insurance Commissioner suggests, that § 234A gives the Commissioner authority to reject the properly presented claims of insurers that they do not find it economically feasible to continue insuring a certain class of risk. Neither the language nor the history of § 234A supports the proposition that hearings undertaken to evaluate a claim brought under § 234A are to be transformed into rate hearings. If, after a final rejection of a rate increase request, an insurer believes that continued coverage of a certain class of risk cannot be maintained without economic disadvantage or loss to it, then § 234A does not authorize the Commissioner to require that the insurer continue coverage of that class of risk. Section 234A does not allow the Commissioner to force insurers, against their will, indefinitely to continue covering a particular class of risk.

However, in this case St. Paul did not exhaust the administrative remedies available to it with regard to the rate increase it sought. St. Paul was granted a 45.9% rate increase, effective January 4, 1974. It informed the Maryland Medical and Chirurgical Faculty that if it could not obtain another rate increase, it would cease writing medical malpractice insurance. Shortly thereafter it sought another increase of 48%. The Commissioner tentatively rejected this request. St. Paul did not seek further adminstrative consideration of this requested rate increase. The Insurance Code, Art. 48A, § 242B (1), provides that if an insurer is aggrieved by a pre-hearing decision of the Commissioner such as was made here, then the insurer may request a hearing and the Commissioner "shall" grant a hearing and consider his prior action. The section goes on to

provide that the Commissioner, after the hearing, shall affirm, reverse or modify his prior action, specifying the reasons therefor.[4] St. Paul did not pursue its remedy under this section. Rather, the company immediately announced that it would cease medical malpractice coverage.

This action by St. Paul was "arbitrary" within the meaning of that term as used in § 234A. Moreover, St. Paul's action was not "reasonably" related to the insurer's stated business purpose within the meaning of § 234A. The insurer's stated business purpose was that it could not obtain a rate increase, but it failed to pursue its administrative remedy to obtain such increase. If St. Paul had gone through the complete administrative procedure available to it and then withdrawn from writing medical malpractice insurance, the Commissioner would not be able on § 234A grounds to reject

---

4. Section 242B (1) states:

"Any insurer or rating organization aggrieved by any order or decision of the Commissioner under this subtitle made without a hearing, may within thirty (30) days after notice of the order to the insurer or organization, make written request to the Commissioner for a hearing thereon. The Commissioner shall hear such party or parties within twenty (20) days, after receipt of such request and shall give not less than ten (10) days' written notice of the time and place of the hearing. The hearing shall be concluded within fifteen (15) days from the commencement thereof; provided, however, that the Commissioner, upon application with notice to the interested parties and for good cause shown, may grant additional time, not exceeding fifteen (15) days. Within twenty (20) days after the conclusion of such hearing the Commissioner shall affirm, reverse or modify his previous action, specifying his reason therefor, and shall give a copy of such order or decision to all interested parties. In the event of the Commissioner's failure to hold or complete the hearing or to render his order or decision within the period specified herein, the filing or application in issue shall be deemed to meet the requirements of this subtitle and shall be deemed approved.

"The order shall contain specific findings of fact by the Commissioner in relation to the matter before him, such findings to be supported by a preponderance of the evidence on consideration of the record as a whole. Any party may file with the Commissioner proposed findings of fact, to be accepted or rejected by the Commissioner.

"Pending such hearing and decision thereon the Commissioner may suspend or postpone the effective date of his previous action.

"Nothing contained in this subtitle shall require the observance at any hearing of formal rules of pleading or evidence."

St. Paul's business decision that a rate increase could not be obtained which would allow it to continue in business. In such an eventuality, the action of St. Paul in withdrawing from the field of medical malpractice insurance could not be said to be "arbitrary" and would be "reasonably related" to its "business purpose," as those terms are used in § 234A.

However, the company's precipitous action, in failing to explore fully the possibilities available to it with regard to an increase in rates, deprived the Commissioner and the public of the ability to determine whether the company's claim that it could not obtain rate relief was correct. Thus, the Commissioner could determine that St. Paul's action was arbitrary, and he was not, at that point, obligated to accept St. Paul's business judgment with regard to its inability to continue writing medical malpractice coverage.

I would affirm the order of the Baltimore City Court that St. Paul Fire and Marine Insurance Company renew Dr. Levine's policies and "continue to accept the business of physicians' and surgeons' liability insurance in the State of Maryland."